J. M. WEITH and GEORGE ARENTS v. THE CITY OF WILMINGTON.

The records of a public corporation are admissible in evidence generally. Their acts are of a public character, and the public are bound by them.

The corporate powers of cities and towns are emanations from the State, granted for purposes of convenience, and they are not allowed in the exercise of those powers to contravene the policy of the State, or exceed the powers conferred, and much less those which are either expressly or impliedly prohibited.

Therefore, where the city of W in 1862, borrowed money from A and gave him a bond, which money was used indirectly in aid of the rebellion, and A, before the bond became due, transferred it to B without notice as to its consideration, and the city in 1867, by virtue of an act of Assembly, took up the bond, and issued to B in its place other bonds with coupons attached, who afterwards sells the coupon bonds in open market, for a fair price, and without any notice as to the illegality of the original consideration, to C. In a suit by C against the city, to recover the coupons on the bonds purchased from B : It was held, That C could not recover, for the reason, that all bonds of a like nature had been declared void by the ordinance of the Convention of 1865, and the payment of the same was thereby, and by sec. 13, art. 7 of the Constitution, prohibited, and as being against public policy.

Bonds issued by municipal corporations, under their corporate seal, payable to bearer, are negotiable, and are protected in the hands of the rightful owner, by the usages of commerce, which are a part of the common law.

(Henderson v. Shannon, 1 Dev. Law, 147; Calvert v. Williams, 64 N. C. Rep. 168; Marsh v. Brooks, 11 Ired. 407, cited and approved.)

CIVIL ACTION, tried at June Term, 1872, of the Superior Court of NEW HANOVER county, before *Russell, J.*

The plaintiffs commenced their action before a Justice of the Peace, demanding the payment of certain coupons attached to bonds issued by defendant, under "An Act to enable the City of Wilmington to provide for the debt of said city contracted prior to the year 1866," ratified the 27th day of February, 1867. Judgment was rendered by the Justice in favor of the plaintiffs, and the defendant appealed to the Superior Court.

On the trial in the Court below it was in evidence that the plaintiffs purchase the bonds, to which the coupons sued on were attached, in open market in the city of New York, giving therefor full value, (the market price,) and that the purchase was made before the bonds or coupons became due; and that the plaintiffs had no notice of anything affecting the validity of the bonds or coupons, and were *bona fide* holders of the same, for value, without notice.

The defendant offered in evidence the record of the proceedings of the Mayor and Board of Aldermen of the city of Wilmington, for the years 1862 and 1867, for the purpose of showing, that the bonds before alluded to, was delivered to James Dawson, in payment of a bond made to John Dawson, the 19th May, 1862, for $10,000; and that this bond of $10,000 was given to John Dawson for money advanced by him, to be used, and which was used by the city in aid of the rebellion. To the reception of this evidence the plaintiffs objected. It was permitted by his Honor, and the plaintiffs excepted.

It was also in evidence for the defendant that the bond of $10,000, of 19th May, 1862, to John Dawson had been transferred to James Dawson, and that it was in payment of this bond, that the ten bonds for $1,000 each, were issued to James Dawson, and that the coupons sued on were detached from some of the same.

There was also evidence on the part of the plaintiffs, that James Dawson purchased the bond, ($10,000), from John Dawson, in June 1862, before its maturity, and paid the full amount of the same, principal and interest, in Confederate money; that he purchased without any notice of the purpose for which the money had been loaned by John Dawson to the city, or to what use the money had been applied by the city, or without notice of anything affecting the validity of the bond. There was further evidence tending to show, that the claim of James Dawson had been referred to a committee of the Board of Aldermen to ascertain the consideration of the original $10,000 bond, and to determine whether it was a just and legal claim against the city. That the committee reported the claim to be due and owing by the city, and the Board after examination approved it, and exchanged the bonds (coupon) therefor.

Several instructions were asked by the counsel for both parties, all of which appear in the opinion of the Court.

His Honor charged the jury, " That if they should find that the bond of $10,000 given to John Dawson, of 19th May, 1862, was for the loan of money in aid of the rebellion, and should further find, that this bond had been transferred to James Dawson, and that if it was in payment of this bond held by James Dawson, that the city bonds sued on, were issued and disposed of by the Board of Aldermen, that then the said bonds were void and the plaintiffs could not recover."

His Honor also charged, that " the plaintiffs could not recover, even if the jury should further find, that James Dawson purchased the John Dawson bond before it became due, for full value and without notice, and that afterwards, in pursuance of the act of the Assembly referred to, the Board of Aldermen had audited and approved the James Dawson claim, and had issued the bonds sued on in payment thereof; and though the jury should further find, that

the said bonds so issued as aforesaid, had come into the hands of the plaintiffs as innocent holders, that they purchased the same in open market, for full value and without notice. For, the bonds being void in their inception, would be void into whosoever hands they might come." To this charge of his Honor the plaintiffs excepted.

The jury returned their verdict for the defendant. Rule for a new trial; rule discharged. Judgment against plaintiffs for costs, and appeal by them.

*Strange*, with whom was *Wright & Steadman*, for appellant, cited among others, the following authorities: *Calvert* v. *Williams*, 64 N. C. Rep. 168 ; *Kingsbury* v. *Suit*, 66 N. C. Rep. 601 ; *Poindexter* v. *Davis*, et al., 67 N. C. Rep. 112 ; *Henderson* v. *Shannon*, 1 Dev. 147 ; *Cronly* v. *Hall*, 67 N. C. Rep. 9.

*London*, contra.

READE, J. 1. The defendant offered in evidence the records of the proceedings of the city council, and the first question is, as to their admissibility.

Such writings are denominated in the books, " official registers," and are divided into two classes, viz: official registers of corporations of a private nature, and official registers of corporations of a public nature.

The records of *private* corporations are admissible, as between the members thereof, but not as against strangers. This is the general rule, subject to some exceptions, which it is not necessary to consider. The records of *public* corporations are evidence generally. Their acts are of a public character, and the public is bound by them. 2 Phil. Ev. ; Greenleaf, Ev. 484.

Among the records so admissible, are expressly enumerated, " the books of record of the transactions of towns, city councils and other municipal bodies." The corporation of

:a city, and municipal corporations generally, differ from private corporations. They more nearly resemble the Legislature, acting under a constitution prescribing its powers. Their acts are of a public character, and the confidence given to them is founded on the circumstance, that they have been made by authorized and accredited agents, appointed for the purpose, and on the publicity of their subject matter.

We are of opinion that the records were properly admitted in evidence.

2. The second question is, whether the bonds sued on are void by reason of the illegality of the consideration.

The facts are, that John Dawson advanced money for the city of Wilmington to obstruct the river in aid of the rebellion, and that the city gave him a bond to secure the money so advanced, and that John Dawson transferred the bond to James Dawson for value, and without notice of the illegal consideration; and then the city of Wilmington gave to James Dawson the bonds sued on, in substitution for the John Dawson bond; and then the plaintiffs bought the bonds in the market for value, and without notice of any illegality.

We will first consider the case, as if it were between individuals,—as if the city of Wilmington, the defendant and maker of the bonds, were an individual. We would then have this case: A executed to B a negotiable instrument, the consideration of which is illegal, so that it is voidable by A as against B; and B transfers the instrument to C for value and without notice. Can C recover of A upon the instrument? It is settled that he can. The only exception is, where the illegality is by statute, which provides that the instrument shall be void, not only as against the maker, but into whosoever hands it may fall. And this is the only difference between considerations *malum in se*, and *malum prohibitum*. The maker is liable, under the law merchant,

for the safety and benefit of trade and commerce. *Hender-son* v. *Shannon*, 1 Dev. Law, 147; *Mercer Co.* v. *Hacket*, 1 Wallace, 83. And see other cases cited by plaintiff's counsel.

But if this were not so, if the assignee for value and without notice, of the negotiable paper, could not recover upon the original paper against the maker, the maker being an individual, still there is another view of the case to be considered. This action is not upon the original paper, but the original paper was surrendered to the defendant by James Dawson, the assignee of the obligee, and the present bond taken in its stead. That presents this case : A wins money of B at cards, and takes a bond. A assigns the bond to C for value and without notice of the illegality. And B gives C a new bond for the amount, and takes up the original bond. Can C recover of B upon the new bond? Clearly he can. There is no illegality in the consideration of the new bond. B did not give it to C to secure money won at cards, but he gave it to secure the money which C paid A for it. It is true B was not obliged to pay A, but then he had the right to pay him, if he chose not to insist upon the illegality; and C having paid A, B had the right to ratify the payment and to give C a new bond, not upon the original gaming consideration, but upon the new consideration of the money paid by C to A ; and for this *Calvert* v. *Williams*, 64 N. C. Rep., 168, is an express authority.

Leaving out of view, therefore, the fact that the defendant is a corporation, the plaintiffs would be entitled to recover, whether he is to be considered as the assignee for value without notice, of the original bond, or whether he is to be considered in the still more favorable position of the assignee for value, and without notice, of the new bond which was given in consideration of the money advanced by James Dawson to John Dawson in payment of the original bond.

3. It is objected that no recovery can be had upon the bonds sued on, for the reason that they are not payable to

any person on their face, but are payable to *bearer*. And such was the common law. And in *Marsh* v. *Brooks*, 11 Ired. 409, it is said, that although a bill or promissory note may be made payable to A or bearer, yet a *bond* cannot. That, being a deed, must be made to some *certain* obligee, to whom it may be delivered. But it would seem that this distinction is no longer observed, and the contrary doctrine is clearly established by numerous decisions and elementary writers. And in *Mercer Co.* v. *Hacket*, 1 Wallace, 83, the Supreme Court of the United States is amusingly contemptuous and indignant at the idea that this "technical dogma of the Courts and of the common law" should be set up to defeat "modern inventions for the necessities of commerce."

"This species of bond is of modern invention," says the Court, "intended to pass by manual delivery, and to have the qualities of negotiable paper; and their value depends mainly upon this character. Being issued by States and Corporations, they are necessarily under seal. But, there is nothing immoral or contrary to good policy in making them negotiable, if the necessities of commerce require that they should be so. A mere technical dogma of the Courts, or the common law, cannot prohibit the commercial world from inventing, or using, any species of security not known in the last century; usages of trade and commerce are acknowledged by Courts as part of the common law, although they may have been unknown to Bracton and Blackstone. When a corporation covenants to pay to bearer, and gives a bond with negotiable qualities, and by this means obtains funds for the accomplishment of the useful enterprises of the day, it cannot be allowed to evade the payment, by parading some obsolete judicial decision, that a bond, for some technical reason, cannot be made payable to bearer."

Without being favorably impressed by its severity against *ancient landmarks*, we follow the decision, as establishing a convenient and useful principle. It will be observed that

the decision only extends to bonds of *corporations.* The seal of a corporation is not used so much to distinguish the *character* of the instrument, as it is to *authenticate* it. It takes the place of a witness. There is no force therefore in the objection, that the bonds are payable to bearer.

4. We come now to the main question: does the fact that these bonds were made by a corporation, distinguish them from the bonds of an individual? We have seen that if they had been the bonds of an individual, and had gone into the plaintiffs' hands as an innocent holder for value, then the plaintiffs would be entitled to recover; for, an individual has the right to give a bond founded on an illegal consideration, and although he is not obliged to pay it, yet he is not obliged to plead the illegality, but may waive it, and may pay the bonds; and if it goes into the hands of an innocent holder for value, then he is obliged to pay it, notwithstanding the original illegal consideration; and if he gives the innocent holder a new bond, it shall not be understood to be upon the old consideration, but upon the new consideration of the money paid for the bond. Yet, the question is, do these considerations hold good, where a *corporation* is the maker?

The general rule is, that a corporation can do only what it is authorized by law to do. If it does any thing else, its act is void; and that without regard to the question of turpitude. It is true, that where the corporation has *power* to act in the subject matter, irregularities or errors as to formalities, will not violate; but if the *power* to do the thing in any form be wanting, then, of course, the act is void, in whatever form done. We must enquire then, whether the city of Wilmington, the defendant, had the *power* to issue these bonds, or to renew them, or to pay them?

In considering this question, it is necessary to keep in view the following ordinances of the Convention of 1865, and the following provision of the State Constitution:

" That all debts or obligations created or incurred by the State in aid of the rebellion, directly or indirectly, are void, and no General Assembly of this State shall have power to assume or provide for, the payment of the same or any part thereof." *Ord. Oct.* 19, 1865.

No county, city, town or other municipal corporation shall assume or pay, nor shall any tax be levied or collected for the payment of any debt, or the interest upon any debt, contracted directly or indirectly in aid or support of the rebellion." *Const. art.* 7, *sec.* 13.

It will be observed that the original bonds to John Dawson were issued in 1862, before either the foregoing ordinance or the constitution was adopted. It is proper, therefore, to consider how that fact affects the question.

Why was it that the Convention of 1865 ordained that the State should never pay any debt contracted in aid of the rebellion? And why was it provided, in the constitution of 1868, that neither the State nor any municipal corporation, should ever pay such debts? Evidently, because the considerations were illegal, and it was against public policy for the rightful government, after its rehabilitation, to pay, or allow to be paid by its municipal corporations, which are but parcels of the State, any debt contracted by the rebel authorities. Suppose, then, that there was no such ordinance, and no such provision in the constitution as quoted above, and suppose the city of Wilmington had issued its bonds, or levied a tax to pay the original claim of John Dawson ; and suppose the question had come before the Court, either by the city refusing to pay the bonds, or by the tax-payers resisting the tax, would this Court, sitting to maintain and administer the laws of the rightful government, enforce the payment of the debt? Clearly not. And why not? Because it would be against public policy. And the Court would hold, that the city authorities had no power to issue the bonds, and no power to tax

the citizens to pay them. But our case is stronger than that; for although the debt was contracted, and the bond to John Dawson given before the ordinance of 1865, yet the policy declared was that it should not be *paid*, although it had been contracted. It is true that the ordinance only declares that the *State* shall not pay such debts, and does not, in terms, expressly include towns, cities, &c. But towns and cities are parcels of the State; their corporate powers are emanations from the State for purposes of convenience, and it could never be allowed that they should contravene the policy of the State, or exercise powers not conferred, much less such as are either expressly or impliedly prohibited. But our case is even stronger than that; for the constitution in express terms includes towns and cities, and forbids them to pay, or levy any taxes to pay, any debt contracted in aid of the rebellion. It not only declares that it was unlawful to *contract* the debt, but that it shall be unlawful to *pay* it. And the tax-payers, by a proper proceeding, could enjoin its payment. This would not be so if the debt had been valid in its inception. In that case it would have been in conflict with the constitution of the United States to impair its obligations.

But the plaintiffs insist that the act of 1867, expressly authorizes the city of Wilmington to issue the bonds to pay its debts contracted prior to 1866, and that the bonds sued on were issued under that act. The plaintiffs must remember that this cuts both ways, as it deprives them of all advantages, from the fact that their bonds are upon a better footing than the original debt; for, if their debts are to be considered as contracted at the date of the bonds in 1867, then they do not fall under the class which the act authorizes the city to give bonds for. But we do not think that the act authorized the city to issue bonds to pay this debt; for the reason that the State had declared by a solemn ordinance that such debts ought not to be paid. The act only

3

intended such debts as the city justly owed and ought to pay.

6. And then it is insisted by the plaintiffs that it was for the city council to determine *what* debts it justly owed and ought to pay; and that its determination of that question is conclusive. It may be admitted that if it had so determined, its action would be *prima facie* evidence of the fact— nothing more. But it appears from the records of its proceedings that it found the facts to be precisely the other way. It set forth the fact that the debt was contracted in aid of the rebellion, viz: putting obstructions in the river, and then it issued the bonds to pay it nevertheless.

By the proceedings 19th May, 1862, it is set forth that John Dawson had advanced money, $10,000, to obstruct the river, and it is ordered, that a bond issue to him for that amount. And by the proceedings of 7th November, 1867, it is set forth, that James Dawson enclosed a copy of the John Dawson bond to the city council and claimed to be the owner thereof. And it was referred to a committee to ascertain the primary consideration. And by the proceedings of 9th January, 1868, they order that the present bonds issue to James Dawson, in liquidation of the note held by him from the Commissioners of the town of Wilmington, dated ay 19th, 1862, and the subject of a communication from him presented to the Board, Nov. 7th, 1867. It will be observed that the ordinance of 1865 not only forbids the *payment* by the State of debts contracted in aid of the rebellion, but it declares the debts *void.* If debts contracted by the State are void, are not the like debts contracted by a city, which is parcel of the State, void? And have the city authorities the power to tax the citizens to pay a void debt? And when the act of 1867 authorized the city to issue bonds to pay its debts contracted prior to January 1st, 1866, did the act mean its *void* debts? Of course not.

The case has been considered, as if the plaintiffs were

holders for value and without notice; and the case was so put to the jury. But it is certainly a very liberal view for the plaintiffs; for the bonds recite that they were issued to secure debts contracted prior to January 1st, 1866, and as the rebellion had existed during four or five years preceding that time, common prudence would have suggested the enquiry, whether they were in connection with the rebellion. But our decision is not affected by that consideration.

There is no error.

PER CURIAM.                              Judgment affirmed.