THIRD NAT. BANK *v.* HARRISON and another.*

SAME *v.* SAME.*

*(Circuit Court, E. D. Missouri. February 13, 1882.)*

1 GAMING LAWS—REV. ST. MO. §§ 5722-3—OPTION DEALS—NEGOTIABLE INSTRUMENTS.

An option deal is not a "gaming or gambling device," within the meaning of the Missouri statutes, and a note given for a balance due on such a deal may be enforced by a *bona fide* holder for value, without notice, if indorsed to him before maturity.

2. NEGOTIABLE INSTRUMENTS—NOTICE.

Where a bank in the absence of a director, by whom a note has been offered for discount, accepts it, and accepts a note payable to him and indorsed to it as collateral, its rights are not affected by such director's knowledge of illegality in the inception of the note accepted as security.

3. SAME—SAME.

An indorsee for value of a promissory note is presumed, in the absence of evidence to the contrary, to have taken it without notice of equities subsisting between the maker and payee.

4. SAME—COLLATERAL SECURITY—DEMAND—BANKING.

Where a bank discounts a demand note for a depositor and receives another negotiable instrument as collateral, the liabilities of parties to the latter are not affected by a failure on the bank's part to make any attempt to collect such demand note when the maker has a sufficient sum on deposit to meet it.

*Reported by B. F. Rex, Esq., of the St. Louis bar.

Motion for a New Trial.

These causes being of a like nature were, by order of court, tried together.

*Dyer & Ellis,* for plaintiff.

*Marshall & Barclay,* for defendants.

TREAT, D. J. These causes of action were based on promissory notes executed by Harrison, to the order of Alexander, payable at the Third National Bank. Alexander indorsed and delivered said notes to said bank as collateral to secure a demand note by him to the bank. The indorsement and delivery of said Harrison notes were contemporaneous with the execution, delivery, and discount of the Alexander note under the following agreement:

"$5,000. ST. LOUIS, MISSOURI, October 4, 1878.

"On demand, after date, I promise to pay to the order of Third National Bank of St. Louis $5,000, for value received; negotiable and payable, without defalcation or discount, at the Third National Bank of St. Louis, with interest at the rate of 10 per cent. per annum after maturity; having deposited in said bank as collateral security for this and other loans—

| | | | |
|---|---|---|---|
| One note, J. W. Harrison, one year, August 28, 1878 | | | $1,188 29 |
| " | " | two years, August 28, 1878 | 1,188 29 |
| " | " | three years, August 28, 1878 | 1,188 29 |
| " | N. F. Coffey, sixty days, September 10, 1878 | | 1,072 35 |
| " | N. F. & J. H. C., sixty days, September 11, 1878 | | 1,050 71 |

—Which ——— hereby authorized said bank, or its president or cashier, to sell without notice at the Merchants' Exchange, in the city of St. Louis, or at public or private sale, at the option of said bank, or of its president or cashier, in case of the non-performance of this promise, applying the proceeds to the payment of notes or evidence of debt held by said bank, including interest, and accounting to ——— for the surplus, if any. In case of deficiency ——— promises to pay to said bank the amount thereof forthwith, after such sale, with interest as above specified. The present cash market value of the above collateral security is ——— dollars; and it is understood and agreed, should there be any depreciation in the value of said security prior to the maturity of any note or claim held by said bank, such an amount of additional security shall be furnished by ——— as will be satisfactory to said Third National Bank; and should such additional security not be furnished within 24 hours after demand on ——— so to do, then and in that event said bank may proceed at once to sell, as above specified, the security herein named.

[Signed]                              "CRAIG ALEXANDER."

This agreement represented the transaction between the plaintiff and Alexander in regard to this loan then made. The debt of Craig Alexander to the plaintiff (secured by this agreement) is yet due; only $500 has been paid on it. Alexander has paid the interest on this loan semi-annually.

The Coffey notes mentioned in this agreement have been renewed from time to time, and renewal notes for that part of the collateral (except $500 which was paid thereon, and which was the credit mentioned as given Alexander in the main $5,000 note) are yet current, in possession of the bank, not matured. These renewals of Coffey notes were all made through Alexander; the bank did not see Coffey in the transaction. Alexander would bring in the renewal note and the bank would take it and give up the old note to Alexander. Demand has never been made of Alexander for the payment of the $5,000 loan. Craig Alexander has been director in plaintiff's bank during the period covered by the dealings mentioned in this case, and is yet such. In the bank it is customary, if a director wants a discount, to have him retire while his paper is being passed on. A memorandum is kept among the bank's papers, for the use of the bank, as receipt of the cashier to the discount clerk. This is numbered 3,470:

"No. 3,470.                    THIRD NATIONAL BANK OF ST. LOUIS,
                                        ST. LOUIS, 10—5—1878.
  "Craig Alexander has deposited in this bank package containing collat. D. L. $5,000, subject to ———— order or instruction.
        [Signed]                        "T. A. STODDARD, Cashier."

The bank had no notice of the transaction out of which the notes grew. Alexander had a large running account at the bank during this time, and was at various times indebted to the bank on general account.

Plaintiff offered in evidence the notes sued on in these cases. Defendant Harrison objected because same are incompetent and irrelevant, and because the pleadings do not deny execution of the notes, and because the notes are void under the Missouri statutes touching gaming and gambling devices. Objections were overruled by the court, to which ruling said defendant excepted at the time. Said notes were then read in evidence as follows:

[*Note No. 1.*]

"$1,188.29.                    AULLVILLE, MISSOURI, August 28, 1878.
  "One year after date I promise to pay, to the order of Craig Alexander, eleven hundred and eighty-eight and twenty-nine one-hundredths dollars, for value received, negotiable and payable without defalcation or discount, and with interest from date at the rate of 8 per cent. per annum. Payable at Third National Bank of St. Louis.                    J. W. HARRISON.
    [Indorsed:]        "W. Q. HARRISON.      CRAIG ALEXANDER.

[*Note No. 2.*]

"$1,188.29.                              AULLVILLE, MISSOURI, August 28, 1878.

"Two years after date I promise to pay, to the order of Craig Alexander, eleven hundred and eighty-eight and twenty-nine one-hundredths dollars, for value received, negotiable and payable without defalcation or discount, and with interest from date at the rate of 8 per cent. per annum. Payable at Third National Bank of St. Louis.                                   J. W. HARRISON.

[Indorsed:]          "W. Q. HARRISON.     CRAIG ALEXANDER.

[*Note No. 3.*]

"$1,188.29.                             AULLVILLE, MISSOURI, August 28, 1878.

"Three years after date I promise to pay, to the order of Craig Alexander, eleven hundred and eighty-eight and twenty-nine one-hundredths dollars, for value received, negotiable and payable without defalcation or discount, and with interest from date at the rate of 8 per cent. per annum. Payable at Third National Bank of St. Louis.                                   J. W. HARRISON.

[Indorsed:]          "W. Q. HARRISON.     CRAIG ALEXANDER.

"I hereby waive protest, demand, and notice of protest.
"*August* 31, 1881.                          CRAIG ALEXANDER."

For the purpose of this case it was then announced by counsel that the following facts were to be considered as agreed upon by the parties hereto, and received by court and jury as proved herein. viz.: That, the plaintiff has had on deposit on general account, to credit of Craig Alexander, at various times since October 4, 1878, more than the sum of $6,000; and that plaintiff has had on deposit on general account, to credit of Craig Alexander, at various times since the institution of this suit, more than the sum of $6,000.

The plaintiff then rested. The defendant Harrison then requested the court to charge the jury as follows: "The court instructs the jury that on the pleadings and evidence herein the plaintiff is not entitled to recover." But the court refused so to charge, to which ruling said defendant then and there excepted. Defendant Harrison then offered to prove the following distinct facts, to-wit:

(1) That each and all of the notes sued on in these cases were originally executed between the maker and the payee, Alexander, for the sole consideration of money won by said Alexander and lost by said defendant Harrison at a game and gambling device known popularly as "option deals."

(2) Said defendant also offered to prove all and singular the facts set up as defences and recited in the answer of defendant Harrison on file in these causes.

But the court refused to admit such evidence, and rejected both said offers of proof as separately made, and to such ruling as to each of said offers the said defendant then and there duly excepted. The

defendant then rested. The court then directed a verdict for the plaintiff in manner and form as found by the jury, to which direction and charge said defendant Harrison excepted at the time. The foregoing was all the evidence given and offered and proceedings had at said trial.

On the foregoing statement it is contended that there was error, because the bank, even if a *bona fide* holder for value, could not exclude from the consideration of the jury the original transactions between the maker and payee of the notes as void under the "gaming laws of Missouri." It may be admitted that as all the parties to these notes are, for legal purposes, resident in Missouri, the contracts are Missouri contracts, and subject to the laws of this state. Said gaming statute is in the following words :

"Sec. 5722. *Bonds, etc., founded on gaming consideration, void.* All judgments by confession, conveyances, bonds, bills, notes, and securities, when the consideration is money or property won at any game or gambling device, shall be void, and may be set aside and vacated by any court of competent jurisdiction, upon suit brought for that purpose by the person so confessing, giving, entering into, or executing the same, or by his executors or administrators, or by any creditor, heir, devisee, purchaser, or other person interested therein.

"Sec. 5723. *Assignment of, shall not affect the defence.* The assignment of any bond, bill, note, judgment, conveyance, or other security shall not affect the defence of the person executing or confessing the same."

This act came under review at an early day by the supreme court of the state of Missouri, when the distinction was sharply drawn between gaming and gambling devices, and mere betting on uncertain events.

Under the statute 9 Anne, *c.* 14, § 1, it was held (*Bowyer* v. *Bampteon*, 2 Strange, 1155) that notes given for money lost at gaming were void, even in the hands of innocent indorsees for value. To the same effect are *Lowe* v. *Waller*, 2 Doug. 716; *Lloyd* v. *Scott*, 4 Pet. 222; *Thompson* v. *Bowie*, 4 Wall. 463. We have been referred to the following authorities as shedding light on the question : Chitty, Bills, 95; Daniell, Neg. Inst. § 197; *Ackland* v. *Pearce*, 2 Camp. 599; *Shillits* v. *Snee*, 7 Bing. 405; *Henderson* v. *Benson*, 8 Price, 281; *Chapin* v. *Dake*, 57 Ill. 296; *Manning* v. *Manning*, 8 Ala. 138; *Hatch* v. *Burroughs*, 1 Woods, 439; *Unger* v. *Boas*, 13 Pa. 601; *Mordecai* v. *Dawkins*, 9 Rich. (S. C.) 262; *Vallett* v. *Parker*, 6 Wend. 615; *Weith* v. *Wilmington*, 68 N. C. 24; *Jordan* v. *Locke*, Minor, (Ala.) 254; *Stone* v. *Mitchell*, 7 Ark. 91; *Eagle* v. *Kohn*, 84 Ill. 292; *Thompson* v. *Bowie*, 4 Wall. 463.

The principle may be considered well established that when a statute pronounces a gaming or usurious contract absolutely void no recovery can be had thereon. The gaming statute of Missouri destroys the negotiable character of a note, or other obligation, given for a gaming consideration within the terms of that statute. The doctrine that void transactions cannot acquire validity by transfer of paper obligations based thereon finds full sanction not only in authorities, (*supra,*) but in the many bond cases before the United States supreme court. 4 Wall. 463; 102 U. S. 625, 278; 103 U. S. 580; 94 U. S. 429.

The broad distinction remains between contracts void *ab origine,* by force of statutes whereby assignees and indorsees are unprotected, and contracts *contra bonos mores,* which cannot be enforced between the original parties thereto, but are held enforceable when, being negotiable in form, they have passed to innocent holders for value.

The notes in question were, it must be held for the purposes of this motion, given for balances on an "option deal," an illegal contract; being, as alleged, a mere betting transaction on future prices, with no purpose of delivering or receiving the articles concerning which the bet was made. If the allegations of the answer are true Alexander could not recover on the notes in suit; and the court was in doubt whether the position the bank occupies should not be considered as exceptional, and thus open the equities between the original parties. It is evident that the bank could at divers times have collected Alexander's demand note and turned over to him the collaterals; and it seemed that defendants' position had great force, viz., that the transfer of Harrison's notes as collateral to the bank under the circumstances was merely for the purpose of excluding the equities between the original parties. Still the stubborn fact remained that the bank is a *bona fide* holder for value within the rules laid down by the United States supreme court in *Swift* v. *Tyson* and *Goodman* v. *Simonds,* no evidence being given that the bank had notice of the infirmity of the paper.

The court holds that the transaction in question is not within the terms of the gaming laws of Missouri, but if it was an option deal, as charged, would be unenforceable between the original parties, and even in the hands of an innocent indorsee for value.

The distinction is so clearly drawn, and the doctrines so exhaustively considered by Judge Thayer, of the St. Louis circuit court, (with whose manuscript opinion in the *Tinsley Case* I have been

favored,) that it would be a mere repetition of what has been thus so ably done, to attempt to travel over the same ground, and hence I quote largely from his opinion as follows:

"The law is now well settled, in all of the states where the question has arisen, that there can be no recovery had upon a contract or sale of personalty where the parties to such contract do not intend an actual delivery of the articles bargained for, but merely intend to settle differences at some future day between the price agreed to be paid for the commodity and the *then* market price. Such contracts are universally held to be invalid, as against public policy, and in some instances they have been held to be in violation of statutes relative to gaming and wagers. *Lyon* v. *Culbertson*, 83 Ill. 33; *Sampson* v. *Shaw*, 101 Mass. 145; *Kirkpatrick* v. *Bonsall*, 72 Pa. 155; *Gregory* v. *Wendell*, 39 Mich. 337; *Rumsey* v. *Berry*, 65 Me. 570; *Williams* v. *Tiedemann*, 6 Mo. App. 269. But there is an apparent conflict of opinion touching the question whether a broker, factor, or commission merchant, who has been employed by his principal to make contracts of this character with some third party, and has done so in his own name, but for his principal's benefit, may maintain an action against his principal to recover money expended for his principal at his principal's request in the settlement of losses accruing under such contracts. This precise question was considered in the *Case of Green*, 15 N. B. R. 201, (U. S. Dist. Court, W. D. Wis.,) and it was there held that the *broker could not recover* from his principal for moneys thus expended in the settlement of losses on such illegal ventures. But it is to be observed that the court, in the case last cited, based its decision mainly on a statute of Wisconsin, which declared all 'notes and agreements *void* that had been given for *repaying any money knowingly advanced for any betting and gaming at the time of such betting or gaming.*' And the evidence in the case cited showed that the broker not only made the illegal contracts in question, but that he advanced the money for the venture. The court accordingly held that the case fell within the statute, and that the broker could not recover money thus knowingly advanced in furtherance of a gambling transaction.

"There are other cases, arising between factors and brokers and their principals, which the courts have apparently treated as though the action was between the principals to the illegal transaction. But the different relation existing between the agent and his principal, in actions by the former to recover moneys expended for his principal in the settlement of losses on wager contracts, was apparently not called to the attention of the court. *Vide Gregory* v. *Wendell, supra; Williams* v. *Tiedemann, supra.*

"On the other hand, the law is well settled in England that if a broker be employed to make wager contracts, such as are voidable under 8 & 9 Vict. *c.* 109, § 18, and at the request of his principal the broker pays the amount due under such contract, *he can recover the amount so paid from his principal,* and the illegal nature of the contract with reference to which the money is paid is no defence to an action founded on such claim. *Warren* v. *Billings*, 33 Law Jour. (1864,) 55, N. S. Common Law, Michaelmas term, 1863; *Pidgeon* v. *Burslem*, 3 Exch. 465; *Jessopp* v. *Surtoryche*, 10 Exch. 614.

"In this country the same doctrine has been held substantially in the following cases: *Lehman* v. *Strassberger*, 2 Woods, 554; *Warren* v. *Hewitt*, 45 Ga. 501; *Clark* v. *Foss*, 10 Chicago Leg. N. 213.

"In the case of *Marshall* v. *Thurston* the court says. 'We understand the charge of the lower court to be, in substance, that if the broker knowingly assisted the defendant by an advance of money and active agency, though not as principal, to gamble in the rise and fall of bonds, no recovery can be had; but if the broker merely acted as his agent in effecting contracts between him and third parties for the purchase or sale of bonds on time, the defendant and third parties intending to speculate in the rise and fall of prices, and defendant suffered losses which were paid by the broker at defendant's request, or were paid and the payments subsequently ratified by the defendant by executing notes therefor, a recovery can be had. In this view the charge is supported by the authorities.'

"The rule which has the support of the great weight of authority (whatever may be thought of the policy and morality of the rule) seems to be as follows: If a factor, broker, or commission merchant be employed by his principal to buy or sell commodities for the purpose of speculating on the rise and fall of prices merely, and the agent buys or sells in his own name, but on his principal's account, and subsequently, after losses have occurred in such transactions, the agent advances money at his principal's request to pay such losses; or if the agent pay such losses and the principal afterwards executes notes in the agent's favor to cover the amounts so advanced, the agent may recover against his principal the advances so made at his request, or upon the notes so executed, notwithstanding the illegal character of the original venture. The promise implied in the one instance and expressed in the other is neither void for want of consideration nor tainted with illegality. It was even held in the case of the *Planters' Bank* v. *Union Bank* that where the defendant, in violation of law, had sold bonds for the plaintiff and received the proceeds, the plaintiff might recover the amount from the defendant, and that the illegal character of the transaction out of which the fund arose was no defence.

"But, on the other hand, if a broker or factor supply his principal with funds for the express purpose of enabling him to engage in illegal transactions, and if he (the agent) conducts the illegal venture in his own name, it seems clear that he becomes a *particeps criminis*, and the law will not aid him to recover moneys advanced for such purpose, nor will it enforce securities taken therefor.

"The facts proven in the case at bar seem to bring the case within the principle last stated. The original notes involved in this controversy, of which those in suit were mere renewals, were not given after the various contracts had been settled, to cover losses which the agent had paid for his principal. The notes seem to have been drawn by the principal in favor of his agent at the inception of the alleged illegal ventures, or within a few days thereafter, while the transactions were still pending and the result undetermined. They were either given to secure moneys advanced by the broker to his principal, to enable the latter to prosecute the ventures, or they were given as an indemnity to the broker, to shield him from losses that he might

sustain while carrying out the alleged illegal ventures in his own name, but on his principal's account.

"In either event, it would follow that the agent could not recover on these notes as against his principal, the maker of the notes, if the contracts or 'deals,' as they are termed, were mere wagers on the fluctuations in the market price of grain, and for that reason unlawful. Obligations thus intimately connected with an illegal transaction, and furnishing an inducement to the same, could not be supported as between the original parties, nor could they be enforced by the present plaintiff if it took the same with knowledge of this infirmity.

"I have no difficulty whatever in finding from the evidence that the parties, both principal and agent, had in view mere *wager contracts* upon the price of grain, and that the losses which the agent or broker eventually paid were paid on contracts which, as between the broker and the parties with whom he dealt, were mere bets upon the future market price of wheat, no delivery having been made or contemplated. To find otherwise on the evidence before me would involve a degree of credulity which the court does not possess.

"The case is thus narrowed to the single inquiry whether the plaintiff bought this paper with knowledge that it was not enforceable as between the maker and payee.

"The defendant would charge the plaintiff with knowledge because the payee of the note was one of plaintiff's directors, and *ex officio* a member of the board of discount. The evidence shows, however, that the bank (the plaintiff in this action) had no regular discount committee. The president was authorized to pass upon paper without the advice of the directory. If the directors were present, they gave advice on paper offered for discount. But in the present instance it appears that the originals of the notes now in suit were accepted in the absence of the director. The director states that when he had paper of his own to offer for discount he stayed away from the board, and that he did so in this instance. Upon this state of facts I am clearly of the opinion that the bank cannot be charged with knowledge of facts possessed by the particular director, who was not present and did not act as member of the board when the paper was accepted. The director was himself the payee, and was offering this paper for discount. Whatever contract the bank made in accepting the paper and passing it to the director's credit, was made with the director. He not only *did not assume* to act as agent of the bank in this particular transaction, but he could not lawfully act in that capacity had he so attempted. *Washington Bank* v. *Lewis,* 22 Pick. 31.

"The present case is widely different from the case of *Bank* v. *Thomas,* 2 Mo. App. 367, cited for the defendants; for in that case the paper was tendered by a *third party,* and the director, whose knowledge was held to affect the bank, was present at the meeting of the committee on discount, and voted upon the paper in the discharge of his regular duties as a bank officer. In the present case the bank cannot be charged with notice of any infirmity in the paper by any sound rule of law with which I am acquainted. Neither does the court concur in the view that the notes in suit are void in the plaintiff's hands, regardless of the question of notice, by virtue of the provisions of the act respecting gaming. Rev. St. 1879, c. 109.

"In the case of *Hickerson* v. *Benson*, 8 Mo. 8, it was held in this state that a wager on the result of an election was not within the terms of the statute respecting gaming, although such wagers were against public policy and sound morality, and void on that ground. And such seems to be the correct view with respect to immoral and fictitious sales of grain and other commodities, where *no delivery is intended* by the parties. Such contracts are simply *contra bonos mores*, and the courts will not enforce them, and would not enforce them in the absence of any statute on the subject of gaming. The result is that judgment must be entered on the notes against both of the defendants for the principal and accrued interest."

The petitions aver that the notes were assigned to the plaintiff; and defendant Harrison contends that, therefore, the equities were open. The difference between indorsement and mere assignment is one well known, and the point is well taken, if not cured by what occurred at the trial, and the verdict. See Daniell, Neg. Inst. §§ 745, 729, 741; *Hedger* v. *Lesby*, 9 Barb. 214; *Calder* v. *Billington*, 15 Me. 398; *Hadden* v. *Rodkey*, 17 Kan. 429.

The usual form of pleading is, when such is the fact, that the notes were indorsed to plaintiff; for the rights springing therefrom are quite different from those arising from an ordinary assignment. Hence, the defendants' position in that respect is technically correct; but as the notes produced and the evidence showed an indorsement to plaintiff, an amendment would have been allowed if attention had been called to the defect. Consequently, the verdict, under the rulings and proofs, must be held to cure that technical error; or, if need be, permission given to make the pleadings correspond to the evidence and verdict.

As Alexander was a director in the bank it is contended that the bank is, in law, charged with knowledge of what was known to him, and the following cases are referred to in support thereof: *Lemoine* v. *Bank*, 3 Dill. 49; *Bank* v. *Davis*, 2 Hill, (N. Y.) 451; *Bank* v. *Thomas*, 2 Mo. App. 367; *Bank* v. *Campbell*, 4 Humph. 394; *Toll Bridge Co.* v. *Betsworth*, 30 Conn. 380.

While the general doctrine is recognized that what an agent knows his principal is charged with notice of, in transactions where said agent is acting for the principal, yet a bond director, in asking for a discount of his own paper, is not an agent of the bank, but acting as the adverse contracting party. Were this held otherwise, no bank could discount paper, to which a director is a party, without losing the position of an innocent indorsee for value under the law merchant. Hence, no bank could have dealings in commercial paper with any

of its directors on ordinary business principles. The opinion of Judge Thayer states the legal aspect of this question very clearly.

It is further contended that inasmuch as Alexander had frequently on deposit, both before and after this suit brought, a sufficient sum of money to pay his demand note, it was the legal duty of the bank to demand payment thereof, and apply his deposits accordingly, thus leaving the collateral discharged of all interest therein by the bank. On this point the court has no difficulty, so far as the legal right of the bank to pursue the collaterals is concerned; yet it would seem that a failure by the bank to take pay for the demand note, and then sue Alexander as indorser of the collaterals, and Harrison, the maker, indicated other than a purpose to collect its demand against Alexander, who was its principal debtor. It had a prompt recourse against him; indeed, had funds in its own hands sufficient to discharge the indebtedness. Why, then, sue him and Harrison, unless its object was, under the formal position of an innocent indorsee for value, to enable Alexander thus to cause a contract to be enforced in his favor which the law would not permit him to enforce in his own name?

It would be easy for the Missouri legislature to destroy, by statute, the negotiability of such paper, but until it has done so the courts must apply the law merchant to its transfer. To what extent inquiry is permissible into the position of parties, as in the case at bar, may be doubtful. The bank can elect its own course by proceeding against Alexander alone on his demand notes, or by enforcing its rights against the collaterals, or possibly by appropriating his deposits to the payment of his indebtedness. While courts should lend no encouragement to betting contracts, yet, so far as the law requires the protection of innocent indorsees of commercial paper, the rules pertaining thereto must be observed. It is obvious that the law may be evaded by giving negotiable notes and having them indorsed to innocent parties; but the remedy is with the legislature. It is said the contract indorsing the collaterals to the bank gave it only the power to sell the same, and not to collect them by ordinary process of law. As indorsee, the right to sue was complete, and the power to sell was an additional advantage which it might or might not exercise. But the question still remains, viz., should not the court have permitted the exact relationship of the parties to these notes to have been developed, to the end that no merely technical screen should be interposed to prevent the defeat of illegal transactions?

The testimony produced, and uncontradicted, proved that the

ordinary course had been pursued as to the transfer of the collaterals, without notice of any defect therein, or of any outstanding equities between maker and payee. Any testimony contradictory thereof, whereby the legal relationship of the parties could be varied, would have been proper; but the contention was that, despite the direct testimony of the cashier, the facts and circumstances indicated that the bank was aiding Alexander to shut out the equities by holding the collaterals, notwithstanding it could have collected the principal or demand note at any time, and thus have released the collaterals. But it was for the bank to continue the demand loan or call it in, as it might determine. It was satisfied with the interest-bearing arrangement, and to take the course which it has done, and which it had the legal right to do. However suspicious the relations of the bank with Alexander may appear as to this point, they cannot overcome the direct and express testimony of the cashier as to the *bona fides* of the indorsements and the consideration therefor.

The motions are overruled.