BOYCE v. O'DELL COMMISSION CO.

(Circuit Court, D. Indiana. July 17, 1901.)

No. 9,910.

GAMING—BUCKET SHOPS—MARGINS—FICTITIOUS TRANSACTIONS—RECOVERY.

Transactions in a "bucket shop," consisting of fictitious contracts of sale or purchase for future delivery of stocks, grain, provisions, etc., with the intention that there should be no delivery, but a settlement by paying the difference of prices, are not a "game," within the meaning of Acts Ind. June 11, 1852 (3 Burns' Rev. St. 1894, § 6676), providing that a person betting on a game, and losing any money thereon, and paying the same, may recover it by action.

At Law.
See 107 Fed. 58.

Harvey, Pickens, Cox & Kahn, for plaintiff.
Ryan & Ryan and Shay & Cogan, for defendant.

BAKER, District Judge. This is an action at law, brought by the plaintiff, James Boyce, against the defendant, the O'Dell Commission Company, for the recovery of divers sums of money, amounting in the aggregate to $3,449.14, alleged to have been lost and paid on a certain game, commonly called a "bucket-shop game," in futures, options, and margins. The amended complaint, so far as material, is as follows:

"That each of said sums had and received by defendant was paid and delivered by plaintiff to defendant within six months immediately preceding the commencement of the original suit under which this action is filed and the filing of the complaint of this plaintiff herein, as and under a bet or wager made by plaintiff with defendant at the time of such payment and delivery in and on a certain game, commonly called a 'bucket-shop game,' in futures, options, and margins, in which games bets and wagers are and were made upon transactions for fictitious delivery in the future upon options, and in which game the bets or wagers are called 'margins'; that said game was carried on as aforesaid, and said bets and wagers were made as aforesaid, in the form of pretended and fictitious contracts of sale or purchase for future delivery of stocks, grain, provisions, cotton, or other commodities, with the intention and understanding on the part of both defendant and plaintiff that no stocks, grain, provisions, cotton, or other commodity should be delivered to or for the plaintiff or defendant, but

that settlement should be made between plaintiff and defendant by merely paying the difference between the market price at the time of settlement, or at the time of the pretended maturity of said pretended and fictitious contracts of sale, and the price agreed upon between the plaintiff and defendant at the time when such bet or wager was made as aforesaid; that each of said sums was paid and delivered as aforesaid, and said bets or wagers were made as aforesaid, and said game was carried on as aforesaid at the city of Muncie, in the county of Delaware, in the state of Indiana; that by reason of the facts aforesaid a cause of action has accrued and now exists in favor of plaintiff against defendant under and by virtue of an act of the general assembly of the state of Indiana approved on the 11th day of June, 1852, entitled 'An act touching gaming contracts,' upon which this action is founded."

To this amended complaint the defendant has interposed a demurrer on the ground that it does not state facts sufficient to constitute a cause of action.

This action is brought under section 6676, 3 Burns' Rev. St. 1894. The statutory provisions found embodied in sections 6675 to 6680, inclusive, substantially in the form in which they there appear, were first enacted by the general assembly of this state in an act entitled "An act to prevent unlawful gaming," approved January 2, 1824 (Rev. Laws 1831, p. 282). The act of 1824 was re-enacted, with slight and immaterial verbal changes, on February 17, 1838 (Rev. St. 1838, p. 324), under the title of "An act to prevent gaming." The present statute was approved June 11, 1852 (1 Rev. St. 1852, p. 305), and took effect May 6, 1853, in the form in which it appears in sections 6675 to 6680, inclusive, 3 Burns' Rev. St. 1894. The acts of 1824 and 1838, in the second section of each, provide:

"That, if any person or persons at any time by playing at any game or games, or betting on the hands or sides of such as do play at any game or games, shall lose to any one or more persons so playing or betting any sum of money or any valuable thing, and shall pay or deliver the same or any part thereof, the person or persons so losing and paying or delivering the same shall be at liberty within six months next following to sue for and recover the money or other valuable thing by an action of debt," etc.

The corresponding section of the act of 1852, being section 6676, 3 Burns' Rev. St. 1894, is as follows:

"If any person, by betting on any game, or betting on the hands or sides of such as play at any game, shall lose to any one any money or other valuable thing, and shall pay or deliver the same or any part thereof, the person so losing and paying the same, may within six months next following recover the money or other valuable thing so lost and paid or delivered, or any part thereof, with costs of suit, by action founded on this act to be prosecuted in any court having jurisdiction thereof."

The contention of the defendant is that the statute now in force does not cover and embrace the subject of betting on options or margins or other gambling by way of betting or wagering upon the rise or fall of the prices of commodities in the market. The counsel for plaintiff contends that the bets or wagers were made upon a bucket-shop game as a mode or system of gaming, and that, therefore, it constitutes betting on a game. A bucket shop does not, of itself, constitute a game any more than a pack of cards or box of dice constitutes a game. The game consists in playing with or using

the cards or dice to determine a bet or wager. To determine whether or not a bucket shop is used as a means or system of playing a game, we must look to the complaint, and ascertain what is alleged to have been done by means of the bucket shop. It is alleged that in the "bucket-shop game bets and wagers are and were made upon transactions for fictitious delivery in the future upon options"; "that the game was carried on and the bets and wagers were made in the form of pretended and fictitious contracts of sale or purchase for future delivery of property, with the intention and understanding of both parties to the contracts that no property should be delivered"; "that settlement should be made between plaintiff and defendant by merely paying the difference between the market price at the time of settlement, or at the time of the pretended maturity of said pretended and fictitious contracts of sale, and the price agreed between plaintiff and defendant at the time when such bet or wager was made." Thus it is manifest that the bets or wagers were laid on the future market price of the commodity, and the market price as it went up or down determined the result. The "options," "margins," "futures," and "fictitious contracts" are simply means used in carrying on the bet or wager. The bet or wager was not laid upon any one or all of these things. They may have been employed as the method or system of carrying on the bet or wager on the rise or fall of the market, but none of these was the thing on which the bet or wager was laid. The wagers were laid upon the future "market price" of a commodity, and not upon any of the instrumentalities employed in carrying on the bet or wager. The "market price" was the thing upon which the bets or wagers are alleged to have been laid. Betting on the future market price of a commodity is not betting on a game. It is betting on an uncertain future event, but it no more resembles a game than does betting on the result of an election, upon a principle of law, the result of a lawsuit, or upon the age, religion, sex, or marriage of a person. It is obvious that the acts of 1824, 1838, and 1852 were not intended by the lawmakers to embrace bets or wagers on the future market price of commodities, for the reason that this species of betting or gambling was then unknown. This consideration is entitled to much weight in the construction of the statute. It is not, however, decisive, for, if betting on the future price of a commodity fairly falls within the meaning of the word "game" as used in the statute, it must be held to be within the statute. But we think it clear that the word "game" cannot, without the perversion of common and correct speech, be construed to embrace a bet or wager on the market price of a commodity. The scope of the statute in reference to the maintenance of an action to recover money or property lost by playing or betting on a game has been passed upon by the supreme court of this state several times. The first case was that of McHatton v. Bates, 4 Blackf. 63. This was an action to recover the value of property lost and delivered upon a wager respecting the result of a presidential election. It was held that, where goods were won on such wager, and were delivered by the loser to the winner, an action could not be sustained to recover the price of the

goods either at common law or under the statute, although such bet or wager was illegal. The court there said:

"It is unnecessary to decide what game or games, if any, other than those named in the first section, are included in the second, since, so far as this decision goes, it is clear that money or property lost on a wager, and paid or delivered, is not within the provisions of the section. No reasoning is required to prove that a wager is not a game, for the proposition is self-evident."

The case of Woodcock v. McQueen, 11 Ind. 14, was an action to recover the value of property lost and delivered upon a wager respecting the result of a state election. The court held that, when a bet or wager is laid and lost upon the result of an election or upon any other act, event, or fact, except a game, it cannot be recovered under the statute. The court said:

"A game we had looked upon as a thing of chance, skill, or trick, involving no principle, no truth; as vicious in itself, or tending to vice; a thing played by gamesters, with their own limbs, or with implements or instruments having no wills of their own, but simply doing that of the respective players. * * * The reasoning by which counsel seeks to establish that an election is a game seems to be this: that betting upon an election is a wager, that a wager is a game, that a game is a wager, and hence that an election is a game or wager. But the error in this reasoning grows out of a confusion of terms. A wager is not a game. Says McKinney, J., in McHatton v. Bates, supra, 'No reasoning is required to prove that a wager is not a game, for the proposition is self-evident.' It is equally self-evident that a game is not a wager. A game is a thing played or done. A wager is the bet or stake laid upon the result of the game. 'Bet' and 'wager' are synonymous terms, and are applied both to the contract of betting and wagering and to the thing or sum bet or wagered. For example, one bets or wagers, or lays a bet or wager, of so much upon a certain result. But these terms cannot properly be applied to the act to be done, or event to happen, upon which the bet or wager is laid. Bets or wagers may be laid upon acts to be done, events to happen, or facts existing or to exist."

The most recent expression of the supreme court of this state is found in Sondheim v. Gilbert, 117 Ind. 71, 79, 18 N. E. 687, 690, 5 L. R. A. 432, 435, 10 Am. St. Rep. 23, 30, where it is said:

"It would be an unwarrantable perversion of common and correct speech to hold that the consideration of a note which had been executed in order to obtain money with which to purchase options, or to put up as margins on cotton speculations, was money won by playing at a game, or betting on the hands of others who do play. However much dealing in options may resemble gambling or betting, and demoralizing and pernicious as it may be, it cannot, with any degree of propriety, be said to be winning or losing money by playing at or betting upon a game, within the meaning of the statute."

The question here involved has been ruled in the same way in other states having statutes similar to our own. In Shaw v. Clark, 49 Mich. 384, 13 N. W. 786, 787, 43 Am. Rep. 474, 476, Judge Cooley, speaking for the court, said:

"In common speech, 'gambling' is applied to play with stakes at cards, dice, or other contrivance, to see which shall be the winner and which the loser. A contract for the purchase of options is not gaming, within the meaning of this term. In form it is the purchase of a commodity to be delivered at a future date, and it only resembles gaming in that the parties take a chance of gain or loss, without intending that the sale which they

nominally make shall ever become a legitimate business transaction. 'Betting,' in common speech, means the putting of a certain sum of money or other valuable thing at stake on the happening or nonhappening of some certain event. A purchase of options is not betting in this sense, though it resembles it in the fact that risks are taken on uncertain events, and that the tendency to those engaged in it is demoralizing. We have no idea that the purchase of options was in the mind of the legislature when passing the statute against betting or gaming."

To the same effect is the case of Connor v. Black (Mo. Sup.) 33 S. W. 783, 784. In this case the defendant sued by way of counterclaim for the recovery of money lost in wagering with the plaintiff on the market price of grain. After pointing out that no recovery could be had at common law, the court said:

"Does he bring himself within the statute? It will be observed that the statute only permits money or property to be recovered which has been lost 'at any game or gambling device.' While this transaction was a wager, and the law will not, in the absence of an express statute, aid either party in enforcing it, it is not 'a game or gambling device,' within the meaning of section 5209, Rev. St. 1889. The words 'game' and 'gambling device' by common use and interpretation had acquired a settled signification long prior to the enactment of the statute declaring transactions like this to be gambling. Thus it was held in Hickerson v. Benson, 8 Mo. 8, 40 Am. Dec. 115, that a wager on an election was not within the meaning of the statute, though the wager was contrary to public policy, and void at common law. Until the enactment of those sections, which specifically denounce these option deals as gambling, they were not within the statute. When they were so declared, the legislature did not provide for a recovery of the money voluntarily invested in such venture. Accordingly, we think that not only the ordinary signification of the words themselves, but the legislation on the subject, alike forbids an interpretation which ascribes to the words 'game' or 'gambling device' the meaning attributed to them by defendant."

In Dows v. Glaspel (N. D.) 60 N. W. 60, 65, it was held that money lost in wagering on the future market price of a commodity could not be recovered at common law. It was also held that a recovery could not be had under a statute which provided that "whoever, by playing at cards, dice or other game, or by betting on the hands or sides of such as are gambling, loses to any person so playing or betting any sum of money or any goods whatever, and pays or delivers the same or any part thereof to the winner, the person so losing and paying or delivering the same may sue for and recover such money in a civil action before any court having competent jurisdiction." The court said: "Without attempting in this opinion an analysis of the statute, we are entirely free from doubt in our view that it does not relate to moneys lost in dealing in options." The same view is held in Bank v. Harrison (C. C.) 10 Fed. 243. The cases cited by counsel for plaintiff arose under different statutes, and are, therefore, not in point. The case of Lester v. Buel (Ohio) 30 N. E. 821, 825, cited by counsel for plaintiff, will sufficiently disclose this difference. In this case it was held that money lost in wagering on options was recoverable under a statute which provided that, "if any person by playing at any game, or by means of any bet or wager, loses to any other person any sum of money or other thing of value, and pays or delivers the same or any part thereof to the winner," the person who so loses and pays may, within the time

named, recover the same from the winner thereof. This statute was properly held to authorize the recovery of money or property lost by means of any bet or wager. Our statute limits the right of recovery to money or property lost on a "game." It follows that the amended complaint does not state a cause of action under the statute of this state. Demurrer sustained. So ordered.