R. W. GLENN v. THE FARMER'S BANK OF NORTH CAROLINA.

The refusal of the Judge below to consolidate several actions brought to recover the amount of certain bills issued by a Bank, the defendant, where it did not appear that the bills sued on were all of like character, and emitted under the same circumstances, was right, and the defendant was not entitled to a new trial on account of such refusal.

The rule that when two witnesses of equal credibility swears affirmatively and negatively as to a certain issue, credit is to be given to the affirmative statement in preference to the negative, is not a rule of law to be laid down by the Court, and it was no error in the Judge to refuse so to charge.

If a statute declares a security void, it is void in whosesoever hands it may come. If however, a negotiable security be founded on an illegal consideration, (and it is immaterial whether it be illegal at common law or by statue,) and no statue says it shall be void, the security is good in the hands of an innocent holder, or of one claiming through such holder.

(Buie v. Kelly, 7 Jones, 266; Weith v. City of Wilmington, 68 N. C. Rep. 24, cited and approved.)

CIVIL ACTION, commenced in a Justice's Court, and from thence carried by appeal to the Superior Court of GUILFORD county, where it was tried before Tourgee, J., at Spring Term, 1873.

Plaintiff sued out twenty-one summons before a Justice of the Peace for the recovery of certain bank bills issued by de-

fendant, and obtaining. judgment, the defendant appealed to the Superior Court. Upon the call of the case, his Honor ordered pleadings to be filed, and the defendant moved to consolidate the several suits into one action. Motion refused, and defendant excepted.

Defendant then moved that the demurrer raised in the plaintiff's replication to the answer be overruled. Motion refused on the ground that there was also an issue of fact, as to the want of notice, involved; and his Honor directed the following issues to be submitted to the jury:

1. Did defendant issue the notes (bank bills) sued on, as a loan to the State of North Carolina and the county of Guilford, to aid in the rebellion, or were any parts of said notes so issued, and if so, what parts?

2. Had the plaintiff notice of the fact, if found, that the notes were issued to aid the rebellion, at the time he received them.                                                                          •

The jury responded to these issues in the negative, finding that the notes were not issued to aid the rebellion, and that the plaintiff at the time he received the same, had no notice of the cause or reason of their issue.

The evidence on the trial of the following issues was substantially as follows:

For the plaintiff, he himself stated that he obtained the bills sued, in the ordinary course of business and gave value for them; and that he had demanded payment therefor, from the cashier of the bank, at their banking-house in Greensboro', on the 21st day of February, 1871, and was refused.

On cross-examination, the plaintiff stated that he purchased the notes on or about the 18th February, 1871, of Wilson & Shober, bankers and brokers in Greensboro, at the price of forty to forty-five cents in the dollar, to the amount of $5,600, and that he paid cash for some, and for the residue he gave his note; that of this sum, $700 secured by his own note, is still unpaid. He further testified, that he had no notice that any portion of the notes of defendant had been issued, or was

bound to the State or county of Guilford, for the support of the war, at or before his purchase, and denied that he had been informed by the cashier, Wm. A. Caldwell, that there was a class of bills, which Caldwell denominated "war issues," and which the bank refused to receive except at very low rates, as compared with other issues.

The cashier, Wm. A. Caldwell, on the part of the defendant, stated, that the bank had made no issue of its notes after August, 1860, until June, 1861; that on the 10th of the latter month, on application by the Public Treasurer, the bank, by its officers, filled up and signed and loaned to the State its notes to the amount of $30,000; that in July, October and November following, it made further loans to the State, of its own bills, through Mr. Courts, the Public Treasurer, to the amount in the aggregate of $95,000. Witness further stated, that during the same period, the bank in like manner, loaned to the county of Guilford, for the purpose of equipping companies to aid the Confederate government, in the war pending, the sum of $5,500. Witness identified those bills, which he denominated "war issues," by their having the letter "B" above the number, 1,401, and the whole of the issue marked with the letter "C," saying that the date of the bills was no criterion or guide in distinguishing them; and of the bills sued on, being of the denomination of five and ten dollars, to the amount of $200, he specified $100 of that amount, by the letters and numbers, as being of the class of war issues. He further stated, that the bank in 1862, purchased of the Public Treasurer bonds of the State, issued for the purpose of paying the tax levied by the Confederate government, to the amount of 48,000, which bonds the bank had sold, except about $2,700 of the same. The latter were exhibited. This witness could not say, that the $100 of the "war issue" sued upon by the plaintiff, was of the parcel loaned to the State, or to the county of Guilford, or was the same used in the purchase of State bonds. It might have been, that he made the loans with bills of other

banks in part, as they might be mixed promiscuously in the till of the bank, and the new issue might have been kept to supply the vacuum. He could not say that the bills in controversy did not get into circulation in that way, that is, in the usual daily transactions with the customers of the bank; though he was of opinion, that they were all issued to supply the loans to the State and the county, and in the purchase of the bonds, as before related.

The witness further stated, that before the plaintiff in this action, purchased the notes, in a conversation between them relating to the payment of a debt the plaintiff owed the bank, and its satisfaction in the notes of the bank, he, the witness, informed the plaintiff that he, as cashier, would not receive in such payment more than one-third of the amount in "war issues," and that he further informed the plaintiff that there was a certain class of notes loaned the State for war purposes, which he included in this name; and that they would not be taken by the bank except at very low rates. Witness stated to plaintiff, that the bank had issued of the letter "B" above the numbers 1,401, and of the letter "C" to an amount of about $145,000 and put them into circulation.

Defendant admitted that $100 of the bills sued upon was free from any of the objections as being issued for war purposes.

The plaintiff having denied that he was informed of the "war issues" by the cashier, as above stated, the counsel of the defendant asked his Honor to instruct the jury—their characters for veracity being in every respect equal—that the positive statement of the witness, Caldwell, was entitled to the greater weight. His Honor declining to give such instruction, defendant again excepted.

For the defendant, it was further asked of the Court, to instruct the jury that the issue by the bank, to pay for State bonds issued as aforesaid, was in aid of the war. Instruction declined, and defendant again excepted.

The case being submitted to the jury, after being sometime out, they were recalled and charged by his Honor, that they

had nothing to do but respond to the issues, and that it was not a matter for their consideration, how a decision either one way or another would affect the parties. That he intended to say this in his first charge, but from oversight omitted it.

The jury again retired, and, after awhile, returned the following verdict in writing:

" We find, first, that one-third of the notes were issued by the defendant to loan to the State in aid of the rebellion ;

" 2d. That the plaintiff had no knowledge of the fact that they had been so loaned at the time he purchased them."

This verdict the Court refused to accept, explaining to the jury its indefiniteness as to which of the bills and how many, were included in the third, they found ; that he should set a verdict, in that shape, aside and grant a new trial. To this the plaintiff excepted. His Honor then repeated his previous charge, that the effect of their decision upon the parties was not a matter for their consideration ; that there were grave questions of law to be decided after their verdict was rendered, which would probably require two Courts to dispose of ; and unless they could select of the $200 in bills delivered to them, the particular notes issued in aid of the rebellion, they should find the first issue in the negative. Defendant again excepted.

His Honor further instructed the jury, that if the notes or any of them, were issued in aid of the rebellion, and the plaintiff had no notice of it at the time of his purchase, it did not affect his right to recover. Again defendant excepted.

The jury returned their verdict as hereinbefore stated, to wit ; finding each of the two issues in the negative. Upon being polled, one of their number said, that " he was satisfied that part of the notes were issued in aid of the rebellion, but not being able to point out the particular bills, under the charge of the Court, he concurred in the verdict."

Defendant moved the Court to set aside the verdict, and grant a new trial. Motion refused. Judgment in accordance with the finding of the jury. Defendant appealed.

*Wm. A. & J. W. Graham* and *Scales & Scales*, for appellant, filed the following brief:

The defendant submits that the judgment below should be reversed:

I. 1st. For refusal to consolidate this with twenty-seven other cases, on demands of the same nature, between the same parties. It was the duty of the Judge to have allowed this motion. 1 Chitty Pl. 199, 200; *Person* v. *State Bank*, 4 Hawkes 294; *Dewey* v. *Kelly*, 7 Jones.

II. For refusal of the instructions relative to the superior credibility of Caldwell over Shaw, the plaintiff.

III. Refusal of instructions prayed, that the issue of notes in purchase of State bonds, issued for war purposes, rendered the contract to pay them void, and this irrespective of notice to the plaintiff. *Kingsbury* v. *Gooch*, 64 N. C. Rep. 528.

IV. For refusal to record the verdict of the jury, which was clear and intelligible, and responsive to the issues submitted. *State* v. *Arrington*, 3 Murph. 571. When a jury returns an insensible or informal verdict, or one not responsive to the issues submitted, they may be directed by the Court to reconsider it, but not otherwise. *Ibid.* (a) This was accompanied by a threat that the Judge would set it aside and grant a new trial if it were so entered; and (b) the remark, that unless they could point out the particular bills issued in aid of the war, they should find for the plaintiff; (c) and the further remark, that they had nothing to do with the result of the cause, whether it would be unfortunate for the one side or the other, and that it would probably take two Courts to decide it after the verdict was rendered, there being still grave and difficult questions to be determined—all this tending to influence the verdict of the jury on the facts, and the response of one of the jury, when polled, showing that this interference was conclusive with him.

V. For error in overruling the defence set up in the pleadings, that the acts of the Legislature and ordinances of the Convention of North Carolina, was an exoneration of the de-

fendant from its obligation to redeem said notes. This opens a wide field for consideration, and should not be decided without thorough investigation.

1. The laws and ordinances of the State were intended clearly to exonerate the bank from payment, at least until the State repaid her loans from the bank. Can they be allowed to have that effect? The charter of this bank was a contract between the State and the corporation, which was of inviolable obligation on both sides, except by agreement of the contracting parties, and by such agreement it is capable of any change or modification.

2. Even without such agreement, so far as pertains to public objects, the Legislature may alter at its pleasure. Thus an act to change the location of the court house in a county is within the competency of the Legislature, although a contract had been made by commissioners appointed by law for the purchase of a particular site for such building. *State* v. *Jones*, Ired. 414. And it is a settled construction of the Constitution of the United States, that no limitations contained in that instrument upon the powers of government extend to embrace the different States, unless they be mentioned or it is expressed so to be intended. *State* v. *Newsom*, 5 Ired. 250.

3. Incorporated banks of issue, such as this, are not mere private institutions, but are established in great part for public ends, and are liable to be modified or regulated in many respects by legislative considerations of the public interest. (a.) Thus the Bank of England was incorporated in 1693, with a capital of £500,000, and was designed to aid the Government by loans in the great financial embarrassments occasioned by the wars consequent on the expulsion of the Stuarts, and the security of the English Constitution under William III—1 Smollet His. Eng. p. 138, ch. 4, sec. 35—a purpose in which it was eminently useful. A century later, in 1797, to maintain the stupendous war which England was maintaining against Napoleon I, the Government directed by act of Par-

liament a suspension of specie payment by the Bank—a measure which was continued under sundry acts till 1821.

(b) In like manner the Bank of North America, under the lead of Robert Morris, was established and found highly beneficial in the latter years of the war of the revolution as a fiscal agent of the Union.

(c) The chartering of the Bank of the United States in 1791, and re-charter in 1816, was a contested measure on constitutional grounds, and was carried and sustained expressly upon the ground that it was necessary, in the constitutional meaning of that word, for the collection, safe keeping and disbursement of the public moneys, including the commission of loans by the Government.

(d) The banks of North Carolina, at least since a serious failure in the Treasury in 1826, have been required to be used as agents of the public fisc, and have usually been chartered, like the one before us, with a stipulation to make loans to the State.

4. The legislative authority of the State, as of the United States, is the sole judge of what is for the interest of the public in relation to finance, currency and banking within its own sphere, and at least with the consent of a banking corporation, may adopt such changes of policy in relation to the operations of such bank as may be deemed expedient, even to a repeal of its charter. Ang. and Ames, sec. 772, p. 878. The contract with the note holder to redeem his paper is subordinate to the great objects of State which may necessitate those changes, and if, by reason of them, he suffers, he may seek his redress in a claim against the State, it being known before he received such paper, that such changes as authorized suspensions are incident to banks of issue. It is no breach of contract with him to suspend, and he is not within the protection of the article in the Constitution of the United States as to "impairing the obligation of contracts."

5. Every citizen is presumed to have notice of the public acts of the State Legislature and of Congress, and the plaintiff

in this case is shown to have acquired these notes long subsequent to the suspension of 1860 and the ordinances proclaiming that no redemption should ever be required until the State should repay the loans had by her from the bank. However it may have been with an innocent holder of such notes, for value, who acquired them before these acts and ordinances, and continued to hold, the plaintiff occupies no such position ; the bank had no contract with him at or before the time when the State announced that no further redemption should be required, and therefore none that could be impaired in its obligations. On the contrary, he occupies the place of an adventurer and speculator, and has to overcome the maxim, " *Nemo debit locupletari ex aliena jactura.*"

6. Every one who received the paper of this Bank after the promulgation of the acts and ordinances of suspension, took it at his own risk, as the notes of the Bank of England were taken from 1797 to 1821,—and such, I learn, has been the decision in a similar case, by a Circuit Judge in South Carolina.

7. Let it not be overlooked, that the plaintiff has no advantage over the defendant in loyalty to the U. S. in the recent war. Both took their chances with the Confederate States.

8. It is a matter of public history, that the object of all the acts in the Legislature and ordinances aforesaid was to cause this bank to issue its notes to aid the war against the United States, therefore all its issues after November, 1860, are void as the contract sued on. *Evans* v. *City of Richmond ; Texas* v. *White, Chiles et al.,* U. S. C., Wallace.

9. But the United States destroyed the bank by an act of Congress taking it out of existence. This was equal in its effect to a calamity caused by the act of God or a public enemy. *Weith* v. *City of Wilmington,* 68 N. C., last clause of opinion.

Plaintiff was not a holder until 1871 and must have known the history of the loans during the war. The repeal in 1860 of the requirement to pay specie was no violation of any contract with him.

*Dillard, Gilmer & Smith* and *L. M. Scott,* contra, submitted the following :

Action is founded on bills of the bank, altogether of 5's and 10's and of letters A. B. C., to the amount of $200. The A's are ante-war; B's above 1401 are *war issues* up to 5,000 ; all under and over are admittedly current and legal ; and all of C. are *war issues.*

This action and all the others are each for $200, composed of bills of the several letters and of different numbers—some within and some without the alleged illegal limit.

1st Exception : On the motion to consolidate the Judge was not in error. It is wholly in the discretion of the Court.

1. *Smith* v. *Bowell,* N. C. Term Rep. 200. The warrants were sixteen in number,—fifteen for $4 and one for $1, on bills of defendant ranging from 2½ cents—consolidation refused in part for the reason,—the plaintiff was less vigorous than he might have been and favor to the defendant in his larger right of stay of execution.

2. *Pearson* v. *State Bank,* 4 Hawks 294. Warrants, on 21 bills, 21 in number, making in all $104. Consolidation allowed—defendant waving a plea in abatement and agreeing to pay the costs of clerk and constable. The Court decided— " it was discretionary—and the causes of action being the same, and great improbability of different defences the Court would not disturb the consolidation."

3. In *Buie* v. *Kelly,* 7 Jones 266, it was ruled, adopting and assenting to *Thompson* v. *Shepherd,* 9 Johnson Rep. 262, " that consolidation *might* be allowed when the notes were *made at the same time,* and might have been *united in the same action,* and when the *defence is the same,* and a reason is given, viz : that it may avoid *oppression.*

In our actions the notes are of different *dates,* different *letters,* some free from objection and some not ; some within and some without the limit of war issues ; some subject to alleged illegality and some not ; and all the alleged illegal issues subject to the question whether the holder had notice of, or

was mixed up in the illegality, and if so to what extent, and as to which of the bills.

*Quere:* If Superior Court can consolidate, the Justices Court might, and the actions being each for $200, the Justice could not consolidate, if he did he would have ousted his jurisdiction. Can or ought the Appellate Court to do that which the lower Court could not have done ?

If Superior Court compellable to consolidate, and one-third of bills on final judgment is refused as illegal, one bill in one parcel, two in another and so on, how will a general trial and judgment in the Superior Court with its *precedents* enable the Justice to distribute the excluded bills in the several separate judgments remaining in his Court in full form—we observe that an appeal from a Justice's Court leaves the judgment then in full force. See C. C. P. sec. 541.

We say then there was no error in refusing to consolidate.

2nd Exception : There was no error in refusing defendant's motion to overrule what he calls a demurrer to the answer. The reply was not a demurrer for it contained an averment of receiving the bills of the bank in the course of business, for value and without notice of illegality, which were matters of fact to the jury and an issue was in fact submitted on that point.

3d. Exception. There was no error in the refusal to charge that Caldwell was entitled to more evidence than Shaw as to the question of notice, each being equally positive, one of a negative, the other of an affirmative.

4th Exception : Upon the question of illegality of notes issued.

1. Bank notes payable to bearer and on demand at a place named are in honor until demand and refusal. *Bank of State* v. *Bank of Cape Fear*, 13 Ired. 75 ; *Crawford* v. *Bank of Wilmington*, Phil. 136.

2. Between the bank and the person first borrowing, the bills may be void for being issued against allegiance of the bank to the United States, but as to all others acquiring them

in the course of circulation and for value they are free from objection. See argument of the Court in, *Weith et al.* v. *City of Wilmington*, 68 N. C. Rep. 24.

3. If illegality is apparent on face, then void throughout the round of circulation. *Cronly* v. *Hall*, 67 N. C. Rep.

There was nothing in the face of these notes indicating illegality and the cashier testified " *that the dates* of the notes were of no importance as a criterion or guide in distinguishing " the war issues, and he, himself, could not distinguish them except by reference to his books, &c.

4. The notes, therefore, being payable to bearer in the usual form, and no illegality expressed or suggested on their face, the defence of illegality is not tenable as against the plaintiff who got them in the usual course of business, for value and without any notice of taint. *Baucom* v. *Smith*, 66 N. C. 537.

5. What is the effect of acts suspending specie payments? Merely a dispensation of forfeiture by the sovereign, leaving the banks like any other person liable to the legal remedies of the holders; if it did more it would avoid and impair the contract and be null and void.

The jury on the issues find:

1. That plaintiff got the notes in the usual course of business and for value.

2. That plaintiff had no notice of any illegality in the issue of the notes.

And on these findings we submit the plaintiff is entitled to recover.

5th Exception: The Judge committed no error in sending the jury back to find and render an intelligent verdict, and one responsive to the issues submitted. *Houston* v. *Potts*, 65 N. C. 41; *Crews* v. *Crews*, 64 N. C. 536.

RODMAM, J. We will consider the exceptions of the defendant successively:

1. That the Judge refused to consolidate the several actions of the plaintiff against the defendant. We are inclined to

think that no appeal will lie from such a refusal, as apparently it does not affect any substantial right of the defendant, C. C. P., sec. 299. Expressing no opinion on this, we think the refusal of the Judge was right. It did not appear that the bills sued on in the several actions were all of the same character, and issued under the same circumstances, so that the defences would be the same to all. *Buie v. Kelly,* 7 Jones 266 sustains this view.

2. Caldwell, an officer of the defendant bank, swore that he had informed the plaintiff before he bought the bills sued on, that there was a certain class of the bills which had been issued in aid of the rebellion, and informed him how he might possibly distinguish them from those issued before the war. The plaintiff swore that Caldwell had not given him such information. The defendant requested the Judge to instruct the jury that the characters of the two witnesses being equal, they should give more credit to the positive, than to the negative statement. The Judge refused. It has been said in some text books, or perhaps in some judicial *dicta,* that if one witness swears affirmatively that he saw or heard a certain thing, and another that he did not see or hear it, although present and able to have seen or heard it, had it occurred, *ceteris paribus,* belief should be given more readily to the affirmative statement; for perhaps, the negative witnesses may not have had his attention excited at the time. But this, like the rule, *"falsum in uno, falsum in omnibus,"* is merely an aid to the judgment of the jury, and not a rule of law to be laid down by the Court. And whatever weight it may have in its proper place, it can have none here. The conversation testified to was between the two witnesses, alone, and each had his attention called to it. The difference in their statements can arise only from a want of truth, or a want of memory, in one of them. Their respective credibility is not to be tested by any arbitrary rule, but by considerations which it is peculiarly for the jury to weigh; for example, the interests or feelings they respectively had in the result of the action; and even from

their demeanor on testifying. We think, for this reason, that the Judge committed no error in refusing the instruction. There is another reason, viz : That it was immaterial whether the plaintiff had notice before his purchase, or not. That question will be considered under the next exception.

3. The refusal to instruct the jury, that if the bills in question were issued to the State, or to the county of Guilford, in exchange for State or county bonds, with the knowledge that the bills were to be used in aid of the rebellion, and they were actually so used they were void, and plaintiff could not recover.

The Judge told the jury, that if the bills were issued in aid of the rebellion, yet if the plaintiff purchased them for value and without notice of the illegal purpose, he could recover.

We understand the Judge as saying, that if the plaintiff had notice of the supposed illegality, before his purchase, he could not recover. The jury do not distinctly find whether the plaintiff had such notice or not. It would seem that they thought he had a certain sort of notice, but that they found for him, because the information which he received, did not enable him to ascertain what particular bills were affected with the supposed illegality. If this was the character of the notice, inasmuch as the burden of proof is on the party alleging the affirmation of notice, such an uncertain notice would be equivalent to none at all. Passing that by, however, and assuming that the notice to the plaintiff was full, then two questions are to be considered :

1. Whether the plaintiff (notwithstanding such notice) is to be regarded as an innocent holder.

On this point. The bills were issued under illegal contracts with the rebel government of the State and of the county. As between the original parties they were void. But it does not certainly appear that all of them were issued directly to the State or county. Some of them (it is uncertain which) were issued to individuals innocent of any guilty knowledge, and in the ordinary course of business. They, or some of them, were

antedated (not with any fraudulent intent) so as to appear issued before secession. They bore on the face no indication by which the public could know that they were issued upon an illegal loan, or otherwise, than in the usual course of business. The officers of the bank could tell from its books that a large number of the bills lettered B, and all lettered C, were issued upon the illegal contract, but the public had no means of knowing this. They were intended to circulate as money, and in the absence of all evidence to the contrary, it must be presumed that they did so circulate to the end of the war. It must also be presumed as a natural and necessary result, in the absence of all evidence to the contrary, that in the course of transmission from hand to hand in the ordinary course of business, they passed to and through at least one innocent holder. That being so, the plaintiff, although he himself had notice before purchase, succeeded to the rights of such innocent holder, and stands in his place. As respects lands, this doctrine is familiar. Rev. Code, ch. 50, sec. 4; Bump. Fraud. Con. 481. And the same principle of equity extends to bills and notes. 1 Parson's Bills and Notes 216; *Masters* v. *Ibberson*, 8 Man. Gran. & L. 100 (65 E. C. L. R.)

If it were otherwise, an innocent holder of land or bills, who received notice of the fraud or illegality after his purchase, could never sell the property, for having notice, he would be bound in honesty to communicate it. He would thus be tied up to an inalienable estate. The rule is, that he can sell his own estate, such as he holds it. On proof by plaintiff of a purchase by him, for value, the burden of proof of notice, not only to him but to all antecedent holders, is on the defendant. *Masters* v. *Ibberson*, ante.

Our conclusion, that the plaintiff is, or represents an innocent holder, brings us to the second question:

2. Whether or not the bills were void in the hands of such holder, by reason of the illegality of their original issue.

It is contended that they are like notes vitiated by an usurious, or a gaming consideration, which can not be enforced

in the most innocent hands, but are always and under all circumstances void. That is the admitted law with respect to such contracts. But the cases which so hold, do it expressly on the ground, that a statute declares such contracts void, and unless full force be given to the mandate, the statutes would be constantly evaded.

In the present case there is no statute making these bills void. By the common law they were void between the parties to the illegal contract, viz: the State and the bank. But the taint does not follow them into innocent hands. The interests of commerce require the rule, that in such a case a party may transfer a better title than he possesses.

The question as to the validity of illegal notes in the hands of innocent holders was so fully considered in *Weith* v. *the City of Wilmington*, 68 N. C., 24, that we deem any further discussion unnecessary now. In that case it was held that the plaintiff was not entitled to recover; but the decision was expressly put upon the ground that the ordinance of 1868 had forbidden municipalities to pay debts incurred in aid of the rebellion. These acts were construed as if they had declared all contracts to pay such debts, void, thus bringing them within the rule which it is settled applies to usurious and gaming contracts.

The rule to be extracted from the' decisions we consider to be this : If a statute declares a security void, it is void in whosoevers hands it may come. If however a negotiable security be founded on an illegal consideration, (and it is immaterial, whether it be illegal at common law or by statute,) and no statute says it shall be void, the security is good in the hands of an innocent holder, or of any one claiming through such a holder.

The case of *Hay* v. *Ayling*, 16 Ad. & Ellis, 423, (71 E. C. L. R.) is a notable illustration of the difference. Gaming securities were declared *void* by 9 Ann. chap. 14, sec. 1, and it was held that they were void in the hands of a *bona fide* innocent endorsee. The act of 5 and 6 W. 4, chapter 41, sec. 1,

modified the act of Ann., and declared they should be *illegal.* The Court held, that after that act they could be recovered on by an innocent holder. See *Masters* v. *Ibberson,* ante.

6. The refusal of the Judge to instruct the jury that by reason of the ordinance and acts of Assembly cited in the answer, the bank was exonerated from the payment of these bills.

Whatever may have been wisely and justly done by governments of unlimited powers, it cannot be an authority to us. This State, during the rebellion, was not the less subject to the Constitution of the United States, than it was before. Though the Constitution was practically powerless during the war, yet upon its termination it is deemed by a sort of *jus post limine* to have been continuously in force, and must be so held to have been by our Courts.

Whatever the intention of the acts cited may have been, the only effect which can be constitutionally allowed them, is to exonerate the banks from the forfeiture of their charters, and other penalties, under the laws of the State. They cannot have the effect to discharge the banks from their liabilities to innocent holders of their bills. That clause of the Constitution which forbids a State to impair the obligation of contracts is too familiar to need a more special reference.

Neither can we consider it a defence to this action that Congress practically deprived the bank of its most valuable franchise, the issue of bills. We are not called on to say whether the act of Congress was either just or constitutional. Our opinion on such a question would be entitled to but little weight. But supposing it to be neither one or the other, it furnishes no defence to this action. If one is lawlessly plundered of all his property by a robber, he is still bound for his debts, at least to those who had no part in the robbery.

Our opinion on these exceptions renders it unnecessary to consider the fourth exception.

PER CURIAM.                    Judgment affirmed.