UNION TRUST CO. *v.* PRESTON NATIONAL BANK OF DETROIT.

1. BANKS—CERTIFIED CHECKS—BONA FIDE HOLDER.

A certified check is valid in the hands of a *bona fide* holder for value, although the maker had no funds in the bank when it was certified.

2. SAME—STATUTES—CONSTRUCTION.

The general banking law (sections 6103, 6107, 6108, and 6147, 2 Comp. Laws), forbidding and making it a crime for a bank officer or employé to certify a check when the amount thereof does not stand to the credit of the drawer on the books of the bank, does not make a check so certified invalid in the hands of a *bona fide* holder for value.

Error to Wayne; Donovan, J. Submitted April 7, 1904. (Docket No. 22.) Decided April 26, 1904.

*Assumpsit* by the Union Trust Company, receiver of the City Savings Bank of Detroit, against the Preston National Bank of Detroit, to recover the amount of a deposit. From a judgment for plaintiff on verdict directed by the court, defendant brings error. Reversed.

*Geer, Williams & Halpin* and *H. R. Martin,* for appellant.

*Walker & Spalding,* for State Savings Bank (contending with appellant).

*Bowen, Douglas, Whiting & Murfin (John C. Donnelly* and *Frederick W. Whiting,* of counsel), for appellee.

Carpenter, J. Plaintiff brought this suit to recover a conceded balance of $21,585.11 owing by defendant to the City Savings Bank at the time plaintiff was appointed receiver. Defendant sought to set off against this indebtedness the sum of $100,000, represented by a check drawn on said City Savings Bank January 24, 1902, by F. C. Andrews, payable to defendant's order, and certified in due form by the teller of the insolvent bank. It appeared that, at the time this check was certified, its maker, Andrews, instead of having funds to his credit in said bank, had overdrawn his account, as shown by the bank's books, "to the amount of $405,000." The defendant offered to prove that it received said check, after certification, on the day it was drawn, in the usual course of business, and paid to said Andrews, the maker, full value therefor, and at that time had no notice or knowledge of any infirmity in said check, or of the fact that the account of said Andrews was overdrawn. This evidence was excluded, on the ground that said check was invalid in the hands of a *bona fide* holder, and a verdict directed for the plaintiff for the amount of the deposit in defendant's hands. The sole question presented by this record relates to the correctness of this holding.

It is authoritatively settled and conceded that at common law the fact that the maker of a certified check had no funds in the bank affords no defense, if the check, negotiable in form, as in this case, has passed into the hands of a *bona fide* holder. See *Merchants' Bank* v. *State Bank*, 10 Wall. 604; *Farmers' & Mechanics' Bank* v. *Butchers' & Drovers' Bank*, 16 N. Y. 125 (69 Am. Dec. 678). This case is not, however, to be determined solely by common-law principles. The correctness of the holding of the trial court depends upon the proper construction of certain statutory provisions in our banking act relative to the certification of checks. Section 6108, 2 Comp. Laws, being section 19 of the general banking act, reads:

"It shall not be lawful for any officer, clerk, agent, or employé of a bank to certify a check, unless the amount thereof actually stands to the credit of the drawer upon the books of the bank, or to resort to any device, or receive any fictitious obligations, direct or collateral, in order to evade the provisions of this prohibition; and any officer, clerk, agent, or employé who shall attempt any such evasion shall, upon conviction thereof, be deemed guilty of a misdemeanor, and punished as provided in section fourteen of this act."

Other sections of the banking act, viz., section 14 (section 6103, 2 Comp. Laws), section 18 (section 6107, 2 Comp. Laws), and section 58 (section 6147, 2 Comp. Laws), make the violation of section 19 a crime.

In construing this act, we have not the benefit of decisions of other courts construing a precisely similar act, for, with the exception of the national banking act, which will be hereafter referred to, there is no similar act.

It will thus be seen that the certification in question was forbidden by law, and punishable as a crime. The statute does not, however, expressly declare that the check so certified shall be void in the hands of a *bona fide* holder. Indeed, it does not expressly declare that it shall be void in the hands of one who is not a *bona fide* holder. The fact,

however, that the certification is forbidden and made a crime, compels the inference that the legislature intended to avoid such certification between the original parties (see *Heffron* v. *Daly*, 133 Mich. 613 [95 N. W. 714]); and this, it is almost unnecessary to say, avoids it in the hands of every one not a *bona fide* holder. It by no means follows, however, because a contract made in violation of law, common or statutory, is void between the original parties, that, if given the form of negotiable paper, it is void in the hands of a *bona fide* holder. Indeed, it is the distinguishing characteristic of the law of negotiable paper that, when a contract takes that form, it is not, in the hands of a *bona fide* holder, subject to the defense which avoided it in the hands of the original parties. Negotiable paper in the hands of a *bona fide* holder is not open to the defense that the contract from which it arose was illegal or forbidden by the principles of the common law. A note given to compound a felony is good in the hands of a *bona fide* holder. *Clark* v. *Ricker*, 14 N. H. 44; *Wentworth* v. *Blaisdell*, 17 N. H. 275. Nothing less than a statutory enactment will subject negotiable paper in the hands of a *bona fide* holder to the defense of illegality in its inception.

What, then, is the effect of a statute which merely prohibits the making of a particular contract, and punishes its making as a crime? How shall we determine what consequences the legislature intended should follow a violation of this law? Manifestly by applying in its construction the principles of the common law.

"Statutes are not, and cannot be, framed to express in words their entire meaning. They are framed, like other compositions, to be interpreted by the common learning of those to whom they are addressed,—especially by the common law, in which it becomes at once enveloped, and which interprets its implications and defines its incidental consequences. That which is implied in a statute is as much a part of it as what is expressed." 2 Suth. Stat. Constr. § 334.

In accordance with these principles, we would assume, and, as heretofore stated, we do assume, that the legislature intended to make such contract void between the parties; and we would likewise assume that it did not intend, if the contract took the form of negotiable paper, to affect its validity in the hands of a *bona fide* holder. But plaintiff's counsel contend that it is settled by authority that, when a contract is prohibited and made a crime by statute, such a contract, if it takes the form of negotiable paper, is void in the hands of a *bona fide* holder; and they rely upon the following authorities: 1 Clark & M. Priv. Corp. § 225; Endl. Interp. Stat. § 449; 2 Suth. Stat. Constr. § 336; Anson, Cont. 172; *Heffron* v. *Daly*, 133 Mich. 613 (95 N. W. 714); *State Life-Ins. Co.* v. *Strong*, 127 Mich. 346 (86 N. W. 825); *Loranger* v. *Jardine*, 56 Mich. 518 (23 N. W. 203); *Bowditch* v. *Insurance Co.*, 141 Mass., at page 293 (4 N. E. 798, 55 Am. Rep. 474); *Union Nat. Bank* v. *Railway Co.*, 145 Ill. 208 (34 N. E. 135); *Cincinnati Mut. Health Assur. Co.* v. *Rosenthal*, 55 Ill. 85 (8 Am. Rep. 626); *Borough of Milford* v. *Milford Water Co.*, 124 Pa. St. 610 (17 Atl. 185, 3 L. R. A. 122);*Edgerly* v. *Hale*, 71 N. H. 138 (51 Atl. 679); *Woods* v. *Armstrong*, 54 Ala. 152 (25 Am. Rep. 671); *McConnell* v. *Kitchens*, 20 S. C. 430 (47 Am. Rep. 845); *Texarkana, etc., R. Co.* v. *Lumber Co.*, 67 Ark. 542 (55 S. W. 944); *Snoddy* v. *Bank*, 88 Tenn. 573 (13 S. W. 127, 7 L. R. A. 705, 17 Am. St. Rep. 918).

None of these authorities, except *Texarkana, etc., R. Co.* v. *Lumber Co.* and *Snoddy* v. *Bank*, which will receive attention later in this opinion, related to a case of negotiable paper in the hands of a *bona fide* holder. All that can justly be claimed for these authorities, with the exceptions above referred to, is that they hold that, when the making of a contract is prohibited and made a crime by statute, it is void as between the original parties, or—what is the same thing—as between parties who do not stand in the attitude of a *bona fide* holder of negotiable paper arising therefrom. It is true that many of these decisions

say that such a contract is void, and one of them (see *Borough of Milford* v. *Milford Water Co.*) says that it "is utterly void; and there is no power that can breathe life into such a dead thing." This language must, however, in accordance with every just principle of construction, be understood as applying to the case before the court. It may not be improper to describe the particular contracts under consideration as void, and as utterly void. But it by no means follows that negotiable paper issued on such contract would be void in the hands of a *bona fide* holder for value. These authorities cannot be regarded as authority for the proposition for which plaintiff's counsel cite them. They are not inconsistent with the rule (which we deem it our duty to undertake to show is well settled by authority) that, though a contract is prohibited and made a crime by statute, that contract, if it takes the form of negotiable paper, is valid and enforceable in the hands of a *bona fide* holder. Says Mr. Daniel, in his work on Negotiable Instruments, § 197:

"The *bona fide* holder for value, who has received the paper in the usual course of business, is unaffected by the fact that it originated in an illegal consideration, without any distinction between cases of illegality founded in moral crime or turpitude, which are termed '*mala in se*,' and those founded in positive statutory prohibition, which are termed '*mala prohibita*.' The law extends this peculiar protection to negotiable instruments because it would seriously embarrass mercantile transactions to expose the trader to the consequences of having the bill or note passed to him impeached for some covert defect."

In *Vinton* v. *Peck*, 14 Mich. 287, defendant was an accommodation maker of a negotiable promissory note dated on Monday, but in fact made on the preceding Sunday, contrary to the statute expressly prohibiting, under penalty of a fine, "any manner of labor, business, or work, except only works of necessity and charity." See 1 Comp. Laws 1857, § 1574. It was held that the note was valid and enforceable in the hands of a *bona fide* purchaser, because "the statute has not declared that notes made

contrary to the Sunday law shall be void under all circumstances. Their invalidity is only to be implied from the prohibition of Sunday business, and under such a statute a *bona fide* holder is protected."

*State Capital Bank* v. *Thompson*, 42 N. H. 369, is almost precisely like the above case.

In *New* v. *Walker*, 108 Ind. 365 (9 N. E. 386, 58 Am. Rep. 40), a negotiable note was taken in violation of a statute requiring, under a penalty, to be stated therein, "Given for a patent right." The court held this note valid in the hands of a *bona fide* holder, saying (pages 374, 375):

"Our opinion is that a statute making it a crime to take promissory notes in a prohibited transaction does not make the notes void in the hands of innocent purchasers, although the person who violates the statute commits a crime. This conclusion is well sustained by authority,"—citing, among other cases, *Palmer* v. *Minar*, 8 Hun, 342, and *Cook* v. *Weirman*, 51 Iowa, 561 (2 N. W. 386), which are similar to the principal case.

In *Smith* v. *Bank*, 9 Neb. 31 (1 N. W. 893), the court expressed its disapproval of a statement in *Kittle* v. *DeLamater*, 3 Neb. 325:

"Or, if the note be founded upon an illegal consideration, prohibited by some positive statute, no recovery can be had, even though the indorsee may not be privy to the original transaction."

In *Hart* v. *Machine Co.*, 72 Miss. 809 (17 South. 769), it was held that negotiable paper issued in violation of a statute of Tennessee forbidding corporations doing business in that State without compliance with its provisions was valid in the hands of a *bona fide* holder, the court saying (pages 833, 834):

"The statute, while forbidding foreign corporations from doing business in the State without compliance with its conditions, does not declare, by express terms, that any contracts made with delinquent corporations shall be void, nor does it denounce as invalid any securities given by or to it under such contracts. The English and some

of the American statutes against usury and gaming declared that all assurances and securities given in consideration thereof should be void.   Under such declarations, it has very generally been held that negotiable paper, even in the hands of a *bona fide* holder, is void, because of the language of the law.   But where only the contract is declared void, and there is no declaration of nullity against securities, it is held that while, as between the parties, and those taking with notice or after maturity, no recovery can be had, a *bona fide* holder will be protected."

In *Press Co.* v. *Bank*, 7 C. C. A. 248, 58 Fed. 321, notes issued in violation of a statute forbidding foreign corporations doing business except in compliance with its terms were held valid in the hands of a *bona fide* holder, the court saying (page 249, 7 C. C. A., page 322, 58 Fed.):

" It is urged that public policy forbids a recovery; that to hold otherwise will nullify the statute.   We do not think so.   If the legislature intended the consequences claimed, we would expect it to say so."

In *Lynchburg Nat. Bank* v. *Scott*, 91 Va. 652 (22 S. E. 487, 29 L. R. A. 827, 50 Am. St. Rep. 860), it was contended that a note obligating the maker to pay usurious interest was void in the hands of a *bona fide* holder.   The court answered that contention by saying (page 659):

"If the maker of a negotiable note contests the right of one who has acquired it by indorsement, for value, before maturity, and without notice of any defense, to recover of him the amount of the note, he must, to prevail, be able to show a statute that in express terms, or by necessary implication, declares the note to be void."

So it has been held:

" If a statute declares a security void, it is void in whosesoever hands it may come.   If, however, a negotiable security be founded on an illegal consideration,—and it is immaterial whether it be illegal at common law or by statute,—and no statute says it shall be void, the security is good in the hands of an innocent holder, or of any one claiming through such a holder."   *Glenn* v. *Bank*, 70 N. C. 191; *Smith* v. *Bank*, 9 Neb. 31 (1 N. W. 893); *Grimes*

v. *Hillenbrand*, 4 Hun, 354; *Hill* v. *Northrup*, 4 Thomp.
& C. 120; *Converse* v. *Foster*, 32 Vt. 828; *Lauter* v.
*Trust Co.*, 29 C. C. A. 473, 85 Fed. 894; *Hatch* v. *Bur-*
*roughs*, 1 Woods, 439 (Fed. Cas. No. 6,203).

Other authorities hold that "when a statute, expressly
or by necessary implication, declares the instrument abso-
lutely void, it gathers no vitality by its circulation, in re-
spect to the parties executing it." 1 Daniel, Neg. Inst. §
197; *Pope* v. *Hanke*, 155 Ill., at page 625 *et seq.* (40 N.
E. 839, 28 L. R. A. 568); *Thompson* v. *Samuels*, (Tex )
14 S. W. 143.

We have already referred to the fact that two of the
authorities cited by plaintiff's counsel, viz., *Snoddy* v.
*Bank*, 88 Tenn. 573 (13 S. W. 127, 7 L. R. A. 705, 17
Am. St. Rep. 918), and *Texarkana, etc., R. Co.* v. *Lumber*
*Co.*, 67 Ark. 542 (55 S. W. 944), arose upon negotiable
paper in the hands of a *bona fide* holder. *Snoddy* v.
*Bank* is authority for this proposition: "Notes given in
consideration of a contract against morals, public policy,
and public statutes are void in any hands." This, as we
have already shown, and as we understand plaintiff's
counsel to concede, is opposed to almost unanimous author-
ity, and cannot, therefore, be accepted as a correct decla-
ration of the law. In *Texarkana, etc., R. Co.* v. *Lumber*
*Co.*, suit was brought upon a negotiable promissory note
made by the plaintiff corporation, contrary to the constitu-
tion and statutes of the State of Texas, for the accommo-
dation of its president. It was held that this note was
void in the hands of a *bona fide* holder. The argument
of the court in support of this contention is this:

"A contract prohibited by the constitution or statute of
a State, although negotiable in form, is not so in fact, and
no innocence or ignorance on the part of the holder will
make it enforceable. It is an absolute nullity,"—citing 1
Daniel, Neg. Inst. § 807, and decisions of the Supreme
Court of the United States and of the Supreme Court of
Texas.

The decisions referred to do not sustain the proposition
for which they are cited. The section of Daniel cited has

reference to cases where an express statutory provision declares a note void.  We cannot follow this authority without repudiating our own decision of *Vinton* v. *Peck*, 14 Mich. 287, and the almost unanimous authority of other courts.

Plaintiff's counsel assert that the case at bar is not ruled by decisions which hold that negotiable paper based upon an illegal consideration is valid in the hands of a *bona fide* holder.  They insist that such cases are not authority, because the statute under consideration in this case did not merely make the consideration illegal; it actually "prohibited and penalized" the making of the contract itself.  We are unable to see that this circumstance, if it affords a sound distinction, distinguishes the case at bar from several of the cases above referred to. In *Vinton* v. *Peck*, *supra*, the particular act which was prohibited and punishable by fine was the making of the note in suit.  It is true that the statute did not in express terms prohibit the making of the note, but, when it prohibited the doing of any business, it did prohibit the making of the note, for, as was expressly said by the supreme court of New Hampshire in *State Capital Bank* v. *Thompson*, 42 N. H., at page 370,—

" Under the construction of our statute prohibiting unnecessary labor on Sunday, the execution and delivery of a promissory note upon Sunday has been declared ' business of a person's secular calling,' * * * and, as such, is prohibited under a penalty."

So, in *New* v. *Walker*, 108 Ind. 365 (9 N. E. 386, 58 Am. Rep. 40), a *bona fide* holder was allowed to recover on a note given for a patent right in violation of a statute which prohibited, under a penalty, the delivery of the note without the insertion of the clause that it was "given for a patent right."  It is idle to say that the making of this note was not prohibited by a penal statute.  See, also, *Palmer* v. *Minar*, 8 Hun, 342; *Cook* v. *Weirman*, 51 Iowa, 561 (2 N. W. 386).  The only distinction that can be drawn between those cases and the case at bar is in the

nature and extent of the punishment for making the contract prohibited by law. Such an inconsequential distinction will not change a rule of law.

We conclude, therefore, that, though the making of a contract is prohibited and made a crime by statute, yet that contract, if it takes the form of negotiable paper, is valid in the hands of a *bona fide* holder for value. We think it also settled that negotiable paper in the hands of a *bona fide* holder for value is not subject to any defense which would avoid it in the hands of the original holder, unless some statute, either expressly or by necessary implication, so declares. We affirm the proposition, denied by plaintiff's counsel, that though the statute, "by necessary implication, make the contract made in violation thereof absolutely void as to nonnegotiable contracts, and as to negotiable contracts in the hands of persons having knowledge of the defects, yet * * * the statute will not be considered to have that effect should the contract be negotiable in form, and be found in the hands of a *bona fide* holder." No strength is added to the foregoing proposition by saying that the statute, by implication, makes void all nonnegotiable contracts, and negotiable contracts in the hands of persons having knowledge of the defect; for it follows from elementary legal principles that all such contracts are unenforceable if the original contract in the hands of the first parties thereto cannot be enforced. Nor is strength added to the proposition by saying that such contracts are "absolutely void." If they cannot be enforced in the hands of the original holders, we see no reason for quarreling with a person who chooses to call them absolutely void, though others might describe them as voidable. See *Thompson* v. *Samuels*, (Tex.) 14 S. W. 143. It follows that plaintiff's counsel deny that negotiable paper can be enforced in the hands of a *bona fide* holder for value, if it arises from a contract which, by implication of law, is void or unenforceable between the original parties. In our judgment, the principle so denied is a correct statement of the law. If it were otherwise, all

negotiable paper arising out of illegal and forbidden transactions would be void in the hands of *bona fide* holders for value, and yet nothing is better settled, by principle and authority, as we have already shown, than that such paper is valid.

There remains to be considered this question : Does the statute, by necessary implication, or by implication, even, make the check void in the hands of a *bona fide* holder for value ?  We have already seen that such implication cannot be found from the circumstance that the certification is prohibited and made a crime.  It is insisted, however, that the intent of the legislature to make the check void in the hands of a *bona fide* holder is indicated by other circumstances.  It is contended that the purpose of the legislature in enacting this law was "to protect the citizens, depositors, and stockholders against just such an act as was committed in the case at bar," viz., an attempt to withdraw the funds of the bank by means of a check falsely certified, and that, to make this purpose effectual, the check must be held void in the hands of a *bona fide* purchaser.  If it were true that the sole purpose of the statute was to protect the depositors and stockholders of a bank against the criminal acts of its own officials, this argument would be very forcible.  Are we warranted in declaring that the sole purpose of the legislature in passing this statute was to protect banks and their depositors from the consequences of criminal misconduct of their officials, and that there were not other purposes, which would fail if plaintiff's construction of the act prevails ?  We must bear in mind that the legislature, in passing this statute in 1887, had not learned the lessons taught by the disastrous failure of the City Savings Bank in 1902, which occasions this litigation, though counsel do not agree as to precisely what lessons are taught by this failure.  We shall not, therefore, be materially aided—indeed, we are rather likely to be misled—if we look to that disaster to throw light upon the legislative purposes.  The legislature has not, by this statute, expressly declared its purpose.  Its purpose, then,

is to be inferred. While we are bound to infer that one of its purposes was to protect the bank and its depositors from the criminal conduct of its officials, it is likewise to be inferred that there was a broader purpose, viz., to promote safe banking generally. We may infer the legislative purpose on the assumption that the law was made to be observed, as well as on the assumption that it would be violated. If the law is observed, we can readily see that it will benefit, and thus infer the legislative purpose to benefit, not merely the depositors and stockholders of banks whose officers are called upon to certify checks, but all persons taking such checks. In other words, the observance of this law tends to increase the certainty of the payment of certified checks and to promote safe banking.

In the case at bar, the allowance of the certified check will inure to the benefit of the stockholders of defendant bank, and to the damage of the depositors of the City Savings Bank, represented by plaintiff. But the law we declare in this case will certainly apply to a case, if such a case should, as it may, arise, where the allowance of such a check inures to the benefit of the depositors of the bank which takes it, and damages no one but the stockholders of the bank whose officials criminally certified it. Such a case would be presented here if the payment of the check under consideration would not sensibly impair the capital of the City Savings Bank, and if the funds withdrawn by its means from defendant had rendered it impossible for the latter to pay its depositors. And in such a case, under plaintiff's contention, the court should say that the legislature intended to prefer the interest of the stockholders of the bank whose officers were guilty of criminal misconduct, to that of the depositors of another bank damaged by such misconduct. We do not think we are warranted in imputing to the legislature such an intent. We think it not improper to infer that it was the legislative purpose to protect the interests of the stockholders and depositors of all banks, and not merely the stockholders and depositors of particular banks whose officials might be guilty of criminal misconduct.

The language of the statute prohibiting the certification does not compel the conclusion that its sole purpose was to protect the bank and its depositors against the criminal misconduct of its officials. Certification of a check is prohibited and made a crime "unless the amount thereof actually stands to the credit of the drawer upon the books of the bank." It will thus be observed that certification is forbidden even though the drawer has funds in the bank which do not stand to his credit upon the bank's books, and certification is not forbidden if the amount of the certified check is credited upon the books, though that credit is fictitious. In making the last statement, we have not forgotten that plaintiff contends that the statute does forbid certification where the entry upon the books is fictitious; but, as stated above, we do not agree with this contention. The statute in such case forbids the fictitious entry; it does not forbid the false certification resulting therefrom. In many cases the distinction might be unimportant; in others it might be very important. Suppose the bookkeeper or cashier of the bank made the fictitious entry, and the teller, acting in the best of faith, relying thereon, certified a check. No reasonable construction of the act would make this certification a crime, or bring it within the statutory prohibition. It will thus be seen that certification is prohibited in a class of cases where the depositors and stockholders of the bank whose officers violated the law cannot be injured, and it is permitted in a class of cases where they are injured. If the sole purpose of the act had been to protect the depositors and stockholders of the bank whose officers were guilty of this misconduct, different language would have been used. We are not, therefore, warranted in saying that this act was passed solely for the purpose of protecting the bank and its depositors from the criminal misconduct of its officers. We are warranted in declaring that there was a legislative purpose in passing this act which would be defeated by the construction contended for by plaintiff.

If the section is construed as plaintiff contends,— if checks duly certified are void in the hands of *bona fide* holders because the amount thereof did not stand to the credit of the drawer on the books of the bank,—this consequence follows: Certified checks, instead of being, as heretofore, the negotiable paper of the bank, and passing as current upon the faith of the bank's credit, will pass, if at all, only upon the credit of the particular bank official who certified it. Every person to whom a certified check is offered will be called upon to determine, not the credit of the certifying bank, not the authority of the certifying official, but the integrity and diligence of that official. Though one may have all confidence in such integrity and diligence, he may hesitate to take the check, because he fears that others to whom he may wish to transfer it lack such confidence. It will result, therefore, that certified checks, instead of being regarded in commercial circles with credit and favor, as heretofore, will be regarded with a degree of suspicion, and are likely to be discredited. If the legislature intended this consequence, —and they must have intended it if they intended that the act should receive the construction contended for by plaintiff,— it seems strange that they left their intent to be ascertained as a matter of doubtful inference; it seems strange that they still left to banks the power of certifying checks, without any clear suggestion that such power was so greatly limited. "If the legislature intended the consequences claimed, we should expect it to say so." *Press Co.* v. *Bank*, 7 C. C. A., at page 249, 58 Fed. 322.

It is suggested, rather than urged, by plaintiff's counsel, that on the authority of *Spitzer* v. *Village of Blanchard*, 82 Mich. 234 (46 N. W. 400), the statute under consideration should be construed as denying to the teller authority to bind his principal, the bank, by the certificate under consideration. In *Spitzer* v. *Village of Blanchard* it was held that bonds issued by a village in excess of the amount authorized by its incorporation act are void in the hands of a *bona fide* holder, the court saying (page 246):

" The amount of the bonds to be issued was known, and appears upon the face of the bonds. The assessed valuation and the vote of the electors are matters of public record, and are open to all the world for inspection and ascertainment, and are as accessible to intending purchasers as other persons. The limitation of power upon the common council appears in the public statute, and is presumed to be known by all dealing with corporate authorities or in corporate bonds."

To show the distinction between that case and the case at bar, we quote from other language in that opinion (page 244):

" Where there is a total want of power,. under the law, in the officers or board who issue the bonds, then the bonds will be void in the hands of innocent holders; the distinction being between questions of fact and questions of law. If it is a question of fact, and the board or officers are authorized by law to determine the fact, then their determination is final and conclusive."

If it were necessary to further distinguish that case from the case at bar, we cannot do better than quote the language of distinguished jurists. Said Mr. Justice Selden in *Farmers' & Mechanics' Bank* v. *Butchers' & Drovers' Bank*, 16 N. Y. 135 (69 Am. Dec. 678):

" It is, I think, a sound rule that where the party dealing with an agent has ascertained that the act of the agent corresponds in every particular in regard to which such party has, or is presumed to have, any knowledge, with the terms of the power, he may take the representation of the agent as to any extrinsic fact which rests peculiarly within the knowledge of the agent, and which cannot be ascertained by a comparison of the power with the act done under it."

Said Justice Davis in *New York, etc., R. Co.* v. *Schuyler*, 34 N. Y., at page 73:

" Where the principal has clothed his agent with power to do an act upon the existence of some extrinsic fact necessarily and peculiarly within the knowledge of the agent, and of the existence of which the act of executing the power is itself a representation, a third person dealing with

such agent in entire good faith pursuant to the apparent power may rely upon the representation."

If authority is needed for the proposition, which seems obvious, that the certification in question related to an act peculiarly within the teller's knowledge, we refer to *Oakland County Sav. Bank* v. *State Bank of Carson City*, 113 Mich. 284 (71 N. W. 453, 67 Am. St. Rep. 463).

It is also urged that it was the intention of the framers of the general banking act to follow generally the provisions of the national banking law, and that we are warranted in inferring an intent to avoid a check falsely certified, in the hands of a *bona fide* holder, from certain changes,—particularly from the fact that, when section 19 (2 Comp. Laws, § 6108) was framed, language was omitted which in the corresponding section of the national banking law, viz., section 5208, Rev. Stat. U. S., clearly indicated the purpose of Congress to make such checks valid. This contention deserves attention. Section 5208, Rev. Stat. U. S., makes it unlawful to certify any check, not, as provided in section 19, unless the amount actually stands to the credit of the drawer on the books of the bank, but unless the drawer "has on deposit *  *  * an amount of money equal to the amount specified in such check." Then follows the provision omitted from section 19: "Any check so certified by duly authorized officers shall be a good and valid obligation against the association." It will be observed that the language omitted in framing section 19, in form, at least, and possibly in reality (see 1 Morse, Banking [4th Ed.], § 414), makes the prohibited check valid, even though not in the hands of a *bona fide* holder. The omission of this sentence, therefore, in section 19, may well be attributed to some other purpose than the intent to make such checks void in the hands of a *bona fide* purchaser. We can well understand the reluctance of a legislature to use language which, even by inference, made such checks valid in whosesoever hands they might be.

It results from these views that the trial court erred in denying defendant the right to prove that it received this check after certification, on the day it was drawn, in the usual course of business, and paid full value therefor, without notice or knowledge of any infirmity, or of the fact that the account of the drawer was overdrawn.

The court has received unusual aid from the excellent arguments and briefs of counsel representing the parties interested in this litigation. Without such aid, we could not have reached so speedy a decision.

Judgment reversed, and new trial ordered.

MOORE, C. J., MONTGOMERY and HOOKER, JJ., concurred. GRANT, J., did not sit.